SANFORD REFFETT AND MAE REFFETT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

H. C. BOLLING AND NELLE M. BOLLING, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83124, 83395. Filed March 14, 1963.

---

[1] 33 T.C. 42 (1959).

*Fortescue W. Hopkins, Esq.*, for the petitioners in Docket No. 83124.
*Steven A. Winkelman, Esq.*, for the petitioners in Docket No. 83395.
*John L. Ridenour III, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax and additions to tax for 1954 as follows:

| Docket No. | Petitioner | Deficiency | Additions to tax, I.R.C. 1939 | |
|---|---|---|---|---|
| | | | Sec. 294(d)(1)(A) | Sec. 294(d)(2) |
| 83124 | Sanford Reffett and Mae Reffett_____ | $2,923.50 | $338.48 | $219.56 |
| 83395 | H. C. Bolling and Nelle M. Bolling_____ | 6,016.52 | 1,104.42 | 716.38 |

Petitioner H. C. Bolling, an attorney (hereinafter referred to as Bolling), represented petitioner Sanford Reffett (hereinafter referred to as Reffett) in an action for damages brought by Reffett against the United Mine Workers of America (hereinafter referred to as UMWA) for destruction of Reffett's coal mine and mining equipment. Reffett obtained a verdict for damages, and the judgment was settled about the middle of 1954 by the UMWA paying to Bolling, as trustee, the sum of $47,750, which Bolling deposited in his trustee account. Distribution of this amount was made as follows:

| | |
|---|---|
| Litigation costs_____ | $155.21 |
| Attorney fees to Bolling (⅓ of recovery less costs)_____ | 15,864.93 |
| Payment to insurance company on subrogation claim_____ | 11,500.00 |
| Check to Reffett, endorsed to Slaughter, a material witness in the case (10% of recovery less certain advances)_____ | 3,959.47 |
| Check to Reffett, endorsed to Toney, a material witness in the case (10% of recovery less certain advances)_____ | 3,459.47 |
| Check to Reffett, for balance_____ | 12,810.90 |
| Unaccounted for_____ | .02 |
| Total recovery_____ | 47,750.00 |

On his income tax return for 1954 Reffett reported $46,750 (the $47,750 paid by the UMWA less $1,000 apparently allocated to interest) as his recovery from the UMWA on destruction of coal mine and equipment, deducted therefrom as expenses the $11,500 paid to the insurance company, certain court costs totaling $392.38, and attorney fees in the amount of $22,664.10,[1] and reported the net amount of $12,193.52 as gain on involuntary conversion. In his notice of defi-

---

[1] How this figure was arrived at is unexplained. However, it appears to have been intended to include the fee paid to Bolling and the two amounts paid to the witnesses Slaughter and Toney.

ciency, respondent added to Reffett's net recovery the sum of $9,111.44 as "Payments to witnesses disallowed." [2] In his petition to this Court Reffett alleged as error respondent's disallowance of the deduction for witness fees and, in the alternative, respondent's error in treating the sum of $7,418.94 paid to the two witnesses as part of the net recovery to petitioner. Petitioner also claimed, in the alternative, an additional deduction of $2,100 paid to the two witnesses for travel and living expenses.

On his income tax return for 1954 Bolling reported as income legal fees and commissions in the amount of $26,613.26, rents collected in the amount of $26,915.15, and interest and miscellaneous income totaling $1,519.13. In his notice of deficiency issued to Bolling, respondent added to Bolling's income $9,111.44 with the explanation that amounts paid to witnesses for testifying in behalf of Reffett in his suit against the UMWA may not be excluded from Bolling's income.

The cases were consolidated for trial. On brief respondent concedes that in the Reffett case only the amount of $6,799.17 is disallowable for witness fees paid, that being the only amount of such fees included in the deduction claimed by Reffett on his return for attorney fees. Also on brief respondent concedes the witness fee issue in the Bolling case and agrees that the amount of $9,111.44 should not be included in Bolling's income as witness fees paid. As a result of the above and other concessions and agreements of the parties the only issues remaining for decision are:

*In the Reffett case, Docket No. 83124:*

(1) Whether the amounts paid to Slaughter and Toney out of the proceeds of settlement of the UMWA suit are excludable from the gross income of Reffett.[3]

(2) If not, whether these amounts are deductible by Reffett.

(3) Whether the amounts of $800 and $1,300 paid by Reffett to Slaughter and Toney, respectively, for living expenses during the pendency of the litigation are either excludable from Reffett's income or, alternatively, deductible by Reffett in 1954.

*In the Bolling case, Docket No. 83395:*

(1) Whether Bolling is liable for an addition to tax under section 294(d)(1)(A), I.R.C. 1939, for failure to file a declaration of estimated tax.

FINDINGS OF FACT.

The stipulated facts are incorporated herein by this reference.

---

[2] The $9,111.44 apparently was intended to include the two checks endorsed to Slaughter and Toney and certain other advances made to them by Reffett.

[3] The amount in issue would appear to be $7,418.94, the total of the two checks endorsed by Reffett to Slaughter and Toney, although because of respondent's concession this is not entirely clear. The correct amount can be decided under Rule 50.

Petitioners in Docket No. 83124 are Sanford and Mae Reffett, husband and wife, who presently reside in Hueysville, Ky. During the taxable year 1954 they were residents of Norton, Va., and filed a joint income tax return on the cash basis for that year with the district director of internal revenue, Richmond, Va.

Petitioners in Docket No. 83395 are H. C. and Nelle M. Bolling, husband and wife, who resided in Norton, Va., during the taxable year 1954 and who filed a joint income tax return on the cash basis for that year with the district director of internal revenue, Richmond, Va.

From about April 1950 through September 18, 1951, Reffett, as sole proprietor, operated a coal mine in the vicinity of Wise, Va. The mining operation was conducted with nonunion labor. On September 16, 1951, certain of Reffett's mining equipment, machinery, supplies, and buildings were destroyed by fire, forcing Reffett to close the mine and go out of business.

Sometime in January 1953 Reffett was informed by an unidentified individual that Bolling, an attorney in Norton, Va., had two individuals in his office who knew something about the fire at Reffett's mine. He went to Bolling's office and met for the first time Bolling, James Toney, and Tony Clarence Slaughter. Slaughter and Toney informed Reffett that they, acting at the behest of the UMWA, had caused the fire at his mine but indicated they would not testify in any legal action Reffett might bring unless he retained Bolling to represent him in the matter. Reffett was also informed that Bolling had Slaughter's and Toney's depositions concerning the fire in his office safe. Reffett then retained Bolling on a contingent fee basis to prosecute a legal suit for damages on his behalf against the UMWA. The contingent fee arrangement was 25 percent of the recovery if settled out of court, 33⅓ percent if tried in the circuit court and settled there, and 50 percent if the case went to the appellate court.

At the same meeting, or shortly thereafter, Reffett agreed to give Toney and Slaughter a percentage of any judgment he might recover. His primary reason for so doing was to insure that they would be available and would testify in his behalf in his suit against the UMWA. In a letter addressed to Toney and Slaughter and dated May 15, 1953, Reffett signed the following statement:

Gentlemen:

I hereby authorize Bolling and Kuczko, my attorneys, to deduct and pay to you, twenty (20) percent of any money coming to me in my law suit against the United Mine Workers of America and District 28, of said Union, now pending in court, which fund will come through their hands, for your services and cooperation heretofore rendered and to be rendered in assisting me in the recovery in this case.

The loans I have made you covering your travel and living expenses prior to the settlement of my case, of course, will be deducted from the above twenty percent.

You can deliver this to Bolling and Kuczko, which they can hold in their file.

Bolling assisted the Commonwealth attorney in the criminal prosecution of a district president of the UMWA in connection with the destruction of property of Vego Coal, Inc. Bolling had also been retained by Vego Coal, Inc., to handle a civil claim of the same nature as Reffett's against the UMWA prior to his first meeting with Reffett. At about the time of his first meeting with Reffett, Bolling was also retained by Toney, Slaughter, and James Mullins, an individual who had been involved in the destruction of property of Vego Coal, Inc., to prosecute claims on their behalf against the union.

On or about January 19, 1953, an indictment was returned by the Grand Jury of Wise County, Va., against Slaughter and Toney, charging them with having feloniously and maliciously burned the property of Reffett. Said indictments were subsequently dismissed on the motion of the Commonwealth attorney on or about August 3, 1955.

On or about January 23, 1953, Reffett filed a civil action against the UMWA seeking damages of $100,000 as a proximate result of the fire at his mine and destruction of his property on September 16, 1951. Bolling represented Reffett in this proceeding, which was tried at the January 1954 term of the Circuit Court of Wise County, Va., and a jury verdict was rendered therein awarding damages to Reffett in the principal amount of $46,750. Slaughter testified at the trial. Prior to the trial Slaughter was threatened and was also offered money not to testify in the Reffett case and other cases against the union. Bolling was aware of the threats and bribes offered to Slaughter.

On or about June 13, 1954, the UMWA satisfied Reffett's judgment against it by payment of the sum of $47,750, which sum included interest. At about the same time the UMWA settled without trial the claims of Vego Coal, Inc., Toney, Slaughter, and Mullins by payments of $30,000, $7,000, $7,000, and $7,000, respectively. These payments were all made to Bolling in one check which he deposited in his trustee account.

On or about July 8, 1954, Bolling disbursed the $47,750 recovery in Reffett's case as set out above. Each of the two checks payable to Reffett and endorsed by him to Slaughter and Toney had on its face the notation: "Bal. in full of compromise Re: Sanford Reffett vs/UMWA." The check payable to Reffett and retained by him bore the following notation: "In full settlement of compromise Re: Reffett v. UMWA."

The disbursement of the $47,750 took place in Bolling's law office and, in addition to Bolling, the following were present: Slaughter, Toney, Reffett, Joseph Kuczko, who was an attorney-associate of Bolling, and Dolly Schell, Bolling's secretary. At the time of the disbursement the $3,959.47 check payable to Reffett was endorsed in blank by him and given to Slaughter. The $3,459.47 check payable to Reffett was endorsed in blank by him and given to Toney. On that same day Toney and Slaughter signed the following statement which was typed in at the bottom of Reffett's letter or memorandum agreement with Toney and Slaughter dated May 15, 1953, and set out above:

To Sanford Reffett:

We hereby acknowledge settlement in full of the amount mentioned in the above letter and all of our claims against you of every nature are hereby compromised and settled and you are hereby released from all claims and demands that may now exist in our favor.

A signature purporting to be that of Dolly Schell appears in the space provided for a witness' signature under this statement.

During the period April 1, 1953, to July 8, 1954, Reffett advanced various sums of money, totaling $1,300, to Toney for living expenses. This $1,300 was taken into consideration in determining the ultimate payment made to Toney under the letter agreement dated May 15, 1953.

During the period April 1, 1953, to July 8, 1954, Reffett advanced various sums of money, totaling $800, to Slaughter for living expenses. The $800 was taken into consideration in determining the ultimate payment made to Slaughter under the letter agreement dated May 15, 1954.

On Schedule D of his income tax return for 1954, Reffett reported as long-term capital gain the sum of $12,193.52, referring for explanation to an attached schedule. The attached schedule reported the gain on the recovery from the UMWA computed as set out above. In his notice of deficiency respondent in addition to disallowing the deduction for witness fees, allocated a part of the amount recovered to capital gains and the balance to ordinary income. Reffett did not contest the allocation in his petition to this Court.

Bolling and his wife filed no declaration of estimated tax for the year 1954. Their income tax return for that year shows, in addition to long-term capital gains in the amount of $4,861.20, gross income from legal fees and commissions in the amount of $26,613.26 and from rents in the amount of $26,915.15. The return shows adjusted gross income of $25,692.65. The deductions taken in determining adjusted gross income were primarily deductions for ordinary business expenses, depreciation, and capital gains. The only business loss of any consequence reported was a "Loss on investment in Norton-Blair Coals, Incorporated" in the amount of $7,731.37. The failure to file a

declaration of estimated tax for the year 1954 by Bolling and his wife, petitioners in Docket No. 83395, was not due to reasonable cause.

OPINION.

The first question presented to the Court concerns the treatment for income tax purposes of certain payments made to witnesses in connection with a legal action brought by Reffett.

Petitioner Reffett claims, at the outset, that by taking inconsistent positions in attempting to tax the witness fees to both Reffett and Bolling, respondent has lost any presumption of correctness normally attaching to his determination and has the burden of proving who is taxable on the witness fees and whether they were paid for the benefit of Reffett or Bolling. The only case cited in support of this claim is *Revell, Inc.* v. *Riddell*, 273 F. 2d 649 (C.A. 9, 1959). Clearly the conclusion of the court in that case does not support Reffett's position; nor does certain dicta in the opinion, upon which Reffett apparently relies. But regardless of presumptions and where the burden of proof lies, and despite somewhat conflicting testimony, we believe the evidence as a whole, viewed in the light of our observation of the witnesses, supports the facts which we have found and refer to herein which we think are relevant to a determination of the issues raised.

Reffett contends that the payments to Slaughter and Toney were not gross income to him, but rather that they were gross income to Slaughter and Toney, alone; or, in the alternative, the payments, or a part of them, were gross income to Bolling and not to him, because when he made the payments he was acting as Bolling's agent and for Bolling's benefit. We think the portion of the recovery that was paid over to Slaughter and Toney was, in the first instance, Reffett's gross income.

It can hardly be questioned from the evidence that the agreement to pay Slaughter and Toney each 10 percent of the amount recovered was a contract between Reffett and the two witnesses. Reffett signed the written agreement and he does not deny that he so agreed. We fail to see how it would make any difference from a tax standpoint whether the arrangement was suggested by Bolling, whether Bolling drafted the agreement, or whether Bolling agreed to reduce his fee in order to give Slaughter and Toney a larger share, all as contended by Reffett and disputed by Bolling. The agreement was still Reffett's—not Bolling's. The evidence also indicates that the agreement was carried out on that basis. Reffett personally advanced funds to Slaughter and Toney during the pendency of the lawsuit. When the suit was settled the UMWA gave Bolling a check covering the amount agreed upon to settle all five claims Bolling was handling. Bolling deposited the check in his trustee account and then distributed

it in accordance with the various contingent fee agreements. After deducting his own fee, certain court costs, and the insurance company's subrogation claim from the total amount he received on Reffett's claim, he drew three checks, all payable to Reffett, for the balance of the Reffett settlement. One of these checks was in an amount which represented 10 percent of the settlement less advances made by Reffett to Slaughter; another was in an amount which represented 10 percent of the settlement less advances made by Reffett to Toney; and the third was for the balance. Reffett had to supply the information as to the amounts he had advanced to Slaughter and Toney. And while he first denied it, Reffett later admitted that he endorsed the checks which were then turned over to Slaughter and Toney. While there is conflict in the testimony as to who directed how this be done, there is no dispute that the settlement and the payments were actually accomplished in the above manner. We must therefore conclude that the amounts paid to Slaughter and Toney were a part of Reffett's gross income, unless as a matter of law they were excludable therefrom.

Reffett contends the payments to Slaughter and Toney were not includable in his gross income under the decisions in *Cotnam* v. *Commissioner*, 263 F. 2d 119 (C.A. 5, 1959), reversing in part 28 T.C. 947 (1957), *A. L. Voyer*, 4 B.T.A. 1192 (1926), and an unpublished opinion of this Court in *Thomas H. Hannaford* (1960). The *Cotnam* case is distinguishable from this case because it was based on the rights of an attorney in his contingent fee under an Alabama statute. We do not have the lien for an attorney's fee involved here. See also *Walter Petersen*, 38 T.C. 137 (1962). Furthermore, the agreement here was stated to be to pay Slaughter and Toney for services rendered, and did not purport to be an assignment of an interest in Reffett's claim as the Court found in *Jones* v. *Commissioner*, 306 F. 2d 292 (C.A. 5, 1962), reversing a Memorandum Opinion of this Court. In the other two cases relied on by petitioner there were conflicting claims to the amounts received and retained by the attorneys and the taxpayer did not actually receive the amount in dispute during the taxable year. Here we have found that Reffett actually received the amounts in dispute and paid them out pursuant to his agreement.

In *Walter F. O'Brien*, 38 T.C. 707 (1962), on appeal (C.A. 3, Jan. 3, 1963), this Court was called upon to decide an issue very similar to the one Reffett has raised here; namely, whether the portion of the judgment that a taxpayer recovered in a legal action that was paid to and retained by his attorneys pursuant to a contingent fee agreement was gross income to the taxpayer. We held that it was. While we recognize there are distinctions in both the type of payments and the issues there involved from the payments and issues here involved, we think the principle applied in the *O'Brien* case is applicable here and will not permit exclusion of these amounts from Reffett's gross income.

The payments made to Slaughter and Toney being a part of Reffett's gross income in 1954, the question remains whether they are deductible in determining his adjusted gross income for that year. Reffett has not set forth in his petition or brief what provision of the Internal Revenue Code he relies upon in claiming the deduction of these payments; but we assume, as does respondent on brief, that in view of the fact that his suit arose out of occurrences connected with his mining business, he is relying upon section 162 of the Internal Revenue Code of 1954.[4] Respondent contends that the payments in question were not "ordinary and necessary," principally because they were violative of public policy, and therefore not deductible. Petitioner contends that the witness payments in this case were not violative of public policy of the Commonwealth of Virginia, where the suit was tried, and hence, are deductible.

Respondent has not brought to our attention any act of the Virginia legislature or any Virginia court decision specifically declaring that it is against the public policy of Virginia to pay contingent witness fees or that the public policy of Virginia would be frustrated if payments such as those made to the witnesses in this case were determined to be deductible, nor have we been able to find any. See *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30 (1958). *Lilly* v. *Commissioner*, 343 U.S. 90 (1952).

Judicial decisions in jurisdictions other than Virginia indicate that contracts to pay witnesses a fee in excess of that provided by law[5] are generally unenforceable for lack of adequate consideration[6] or because they violate public policy. *Ferroline Corp.* v. *General Aniline and Film Corp.*, 207 F. 2d 912 (C.A. 7, 1953); *Alexander* v. *Watson*, 128 F. 2d 627 (C.A. 4, 1942); see Annot., 16 A.L.R. 1457 (1922), and cases cited therein; Williston, Contracts, sec. 1716 (rev. ed. 1938). Such agreements, however, have been held not violative of public policy, and hence enforceable, in some circumstances, such as, when the witness is beyond the jurisdiction of the court and not subject to subpoena, see *Thatcher* v. *Darr*, 27 Wyo. 452, 199 Pac. 938 (1921);

---

[4] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.
SEC. 162. TRADE OR BUSINESS EXPENSES.
(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year * * *

[5] Section 14–186, Va. Code Ann., provides that all witnesses summoned for the Commonwealth shall receive 50 cents for each day's attendance plus ferriage, tolls, and 7 cents a mile for travel over 5 miles.
Section 14–187, Va. Code Ann. (Supp. 1962), provides that each witness, whether from within or without the State, under summons not covered by section 14–186 shall have $1 for each day's attendance plus ferriage, tolls, and 7 cents a mile for travel over 10 miles.

[6] The theory being that a witness has a legal duty to testify and therefore a promise to do something that he is under a duty to do is not adequate consideraton for the promise to pay a fee for the testimony. See *Thatcher* v. *Darr*, 27 Wyo. 452, 199 Pac. 938 (1921).

or when the witness' testimony is privileged because it might incriminate him. *Nickelson* v. *Wilson*, 60 N.Y. 362 (1875) ; see *Thatcher* v. *Darr*, *supra*.[7] However, it seems to be a rather generally accepted rule that all agreements to pay witnesses extra compensation *contingent* on the success of the lawsuit are against public policy whether the agreement is with an ordinary witness, an expert witness, or a witness who cannot be compelled to testify, because such agreements constitute a direct temptation to commit perjury. *Alexandar* v. *Watson*, *supra*; *Hough* v. *State*, 145 App. Div. 718, 130 N.Y. Supp. 407 (1911) ; *Sherman* v. *Burton*, 165 Mich. 293, 130 N.W. 667 (1911) ; Annot., 16 A.L.R. 1457, 1460, 1464 (1922).

But we need not decide the narrow question of whether these payments were violative of sharply defined public policy of Virginia because in our opinion deduction of these payments must be denied on more basic grounds; namely, because they were not "ordinary" within the meaning of section 162.

The question of whether an expense is ordinary within the meaning of section 162 is a question of fact. *Welch* v. *Helvering*, 290 U.S. 111 (1933) ; *Deputy* v. *du Pont*, 308 U.S. 488 (1940). The word has the connotation of normal, usual, or customary. *Deputy* v. *du Pont*, *supra*. An "ordinary" expense may be unique to the individual, but it should not be unique in the life of the group, the community, of which he is a part, *Welch* v. *Helvering*, *supra* at 114. *Deputy* v. *du Pont*, *supra*. Mr. Justice Cardozo, in discussing what an ordinary expense might be in *Welch* v. *Helvering*, *supra*, illustrates his discussion with the example of the counsel fees an individual taxpayer would incur in a lawsuit affecting the safety of his business. See *Kornhauser* v. *United States*, 276 U.S. 145 (1928). He states that such a lawsuit might arise once in the lifetime of an individual taxpayer but—

Nonetheless, the expense is an ordinary one because we know from experience that payments for such a purpose * * * are the common and accepted means of defense against attack. [*Welch* v. *Helvering*, *supra* at 114.]

Payment of contingent witness fees such as those that Reffett paid to Slaughter and Toney is not in our experience the common and accepted means used by a coal operator or any other person in prosecuting an action for damages to his business. Reffett agreed to pay these two men, who admittedly had set fire to and destroyed his property, a percentage of any recovery he obtained because of their wrongdoing, for testifying as to facts within their own knowledge. Regard-

---

[7] At the time Reffett's suit went to trial, Slaughter and Toney were facing criminal prosecution for their part in the fire at Reffett's mine and most likely could have refused to testify on the grounds that they might incriminate themselves. Slaughter's testimony at the trial of these proceedings indicates that a representative of the UMWA offered him a sum of money just prior to the trial of Reffett's suit to do exactly that.

less of the propriety of such an agreement or the public policy involved, we do not think such payments can be considered ordinary in any sense of the word. Neither public policy nor the propriety of the payments was involved in *Welch* v. *Helvering, supra.* Payment of such fees would, in our opinion, be not only unique to Reffett but would also "be unique in the life of the group, the community, of which he is a part." The fact that agreements to pay contingent witness fees have been held to be unenforceable in all the cases we have been able to find dealing with the subject, certainly lends support to this proposition. We conclude that the contingent witness fees paid by Reffett do not qualify as an "ordinary" business expense within the meaning of the statute and are therefore not deductible by Reffett.

For completeness, but without elaboration, we add that under .the concept that the deductibility of business expense is subject to an overriding limitation that it shall not be violative of a sharply defined national or State public policy, see *Tank Truck Rentals* v. *Commissioner, supra,* the claimed deduction would also be disallowed. The proper administration of justice throughout the courts of this land is basic to the general welfare of the public. Contracts for the payment of contingent witness fees have been held to violate public policy because they constitute an invitation to perjury. The courts have refused to enforce such contracts for this reason. To encourage the possibility or probability of perjured testimony by allowance of contingent witness fees as deductions for tax purposes would be lending direct support to a violation of this fundamental requirement for the proper administration of justice—that witnesses testify honestly, truthfully, and candidly, without prejudice because of an interest in the outcome of the case. The principle would appear to be the same whether the issue is enforcement of the contract or allowance of a deduction. The policy of discouraging such agreements and the basic evil involved therein would be frustrated in either event. And this would appear to be a policy sharply enough defined by the courts to require disallowance of the deductions here involved under this concept. Compare *Luther M. Richey, Jr.*, 33 T.C. 272 (1959).

Reffett seems to argue that in substance a portion of the payments which he made to Slaughter and Toney were deductible attorney's fees because they were made by him on behalf of Bolling and for Bolling's benefit. The burden of proving this was upon Reffett and we are not satisfied that such was the case. On the contrary, for reasons heretofore stated, we think the weight of the evidence indicates that Reffett was the principal beneficiary of these payments and that he was acting for himself when he agreed to pay them.

During the period April 1953 to July 1954, Reffett advanced a total of $2,100 to Slaughter and Toney with the understanding that

the amounts would be deducted from their share of any judgment Reffett might recover in his suit. Reffett contends that this $2,100 is deductible in computing the net recovery from his suit. Reffett again has not indicated upon what section of the Code he is relying, but we assume it is section 162 in view of the fact that the suit arose out of an occurrence connected with his business.

We find that the $2,100 is not deductible for two reasons. First, a portion of the $2,100 appears to have been paid to Slaughter and Toney in the year 1953 which year is not before the Court in this case. Sec. 162(a). Secondly, even assuming that the year 1954 was the appropriate year for the deduction, we do not think the $2,100 paid constitutes an ordinary and necessary business expense within the meaning of section 162 for the same reasons that we set forth in our discussion of the deductibility of the portion of the recovery that was paid over to these two witnesses.

Respondent determined that Bolling and his wife were liable for additions to tax under sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 [8] for 1954 in the amounts of $1,104.42 and $716.38, respectively. Respondent has conceded the addition to tax under section 294(d)(2).

Section 58(a) requires an individual taxpayer to file a declaration of estimated tax if "his gross income from sources other than wages [9] (as defined in section 1621) can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more." Sec. 58(a)(2). Bolling and his wife filed no declaration of estimated income tax for the year 1954 and yet their gross income for that year, as reported on their income tax return, from legal fees and rents alone exceeded $53,000. Section 294(d)(1)(A) provides for an addition to tax in the event a taxpayer does not file a declaration of estimated tax within the time prescribed unless such failure is shown to be due to reasonable cause and not to willful neglect. The record does not establish that the failure to file in this case was due to reasonable cause.

Bolling claims that he did not file a declaration of estimated tax for 1954 because the certified public accountant, upon whom he relied to handle all his tax returns, advised him that it was not necessary. For such a fact to be a defense against the consquences for not filing a declaration it must appear that the intervening party was competent to advise the taxpayer on tax matters and that the taxpayer acted on that advice in good faith. *Walter H. Kaltreider*, 28 T.C.

[8] For the remainder of this opinion all references will be to the Internal Revenue Code of 1939 unless otherwise indicated.

[9] Section 1621 defines wages to be remuneration paid by an employer to an employee. As far as we know none of Bolling's income in 1954 arose out of an employer-employee relationship.

121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958); *Rene R. Bouche*, 18 T.C. 144 (1952).

The record is totally void of any evidence as to the qualifications of Bolling's accountant to give advice on tax matters. Bolling testified that he understood his accountant's advice on this matter to be premised upon the conclusion that Bolling would owe no tax in 1954 because of certain losses that he had suffered. The criterion for determining whether a declaration of estimated tax is required under section 58 is the taxpayer's anticipated gross income, not his anticipated adjusted gross income, taxable income, or tax liability. Sec. 58(a); compare sec. 6015(a), I.R.C. 1954. If the accountant's advice was so premised we have doubts as to his competency and/or as to how well he acquainted himself with the provisions of the law relating to declarations of estimated tax. *Lone Pine Lawn Corporation*, 41 B.T.A. 638 (1940), affd. 121 F. 2d 935 (C.A. 2, 1941).

The addition to tax under section 294(d)(1)(A) against Bolling is sustained.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

RAUM, *J.*, concurs in the result.

———

TIETJENS, *J.*, dissenting: The expenditures involved were paid for services in furthering litigation growing out of damage to petitioner's business. They were just as surely ordinary and necessary business expenses as attorney's fees. Apparently the payment of such expenses contravened no "sharply defined" public policy and I think the expenditures properly can be deducted by petitioner.

———

WITHEY, *J.*, dissenting: In my view the majority has mistakenly viewed the amounts paid the two "witnesses" as witness fees or litigation expense. The substance of this transaction seems clearly to be the operation of a joint venture wherein Bolling contributed his services as an attorney for a fixed percentage fee, the "witnesses" contributed their services by way of their testimony and their aid in the gathering of evidence, and petitioner Reffett contributed a chose in action. The "witnesses" were each to receive a fixed percentage of the proceeds from the joint venture and petitioner Reffett was to receive the remainder.

The amounts received by the "witnesses" are not in the nature of witness fees which historically have been measured more or less arbitrarily by legislative bodies by the actual expense and loss to a person called to testify where he is required to travel to do so and to incur possibly his living expenses while doing so. Such expenses are here

shown to have been paid by the "witnesses" themselves. Those amounts were deducted from their percentage shares of the recovery.

It seems clear to me that neither Reffett nor Bolling, the attorney, ever received the amounts received by the "witnesses" in spite of the form of the transaction wherein the "witnesses" were paid by checks of Bolling made out to Reffett and by him endorsed to the respective "witnesses." This was merely form and not substance. The amounts received by the "witnesses" were income to them which could not be income to either Bolling or Reffett because under no theory can it be said that the latter two ever received any portion thereof.

That the transaction might be construed to be extortion or another form of criminal or immoral conduct does not prevent the amounts received by the "witnesses" being actually income to them. *James* v. *United States*, 366 U.S. 213 (1961); *Rutkin* v. *United States*, 343 U.S. 130 (1951).

Public policy is not an issue here because the amounts received by the "witnesses" not having been received by either Bolling or Reffett could not have been "paid" by either to the "witnesses" and are hence not deductible by either as an expense.

———

MULRONEY, *J.*, dissenting: It may be argued that contracts to pay witnesses, contingent upon recovery, would be unenforceable on the grounds of public policy, and that generally payments pursuant to such contracts should not be deductible from income as ordinary and necessary business expense. However, I feel the application of such a general rule is or should be subject to some exceptions. "[E]ach case should depend upon its peculiar circumstances." *Commissioner* v. *Heininger*, 320 U.S. 467. I feel that here it fairly appears that the contingency arrangement for the attorney and witnesses was not initiated but merely acquiesced in by petitioner. Where the special facts and circumstances show enforcement is by deduction from the recovery, which recovery is admittedly taxable income to the taxpayer,[1] and where he has no choice but submit to the contract or abandon the recovery attempt, I feel the deduction should be allowed. After all, under the special facts and circumstances here, public policy was about as well served by exposing the UMWA conspiracy, as it would be if the innocent victim of the criminal conspiracy had rejected the terms forced upon him by those who were in a position to testify or not as they saw fit. I feel under the special facts and circumstances present

———

[1] The circumstance that, without the litigation expenditure there would have been no income to tax, was held conclusive on the issue of ordinary and necessary expense in the opinion of the Seventh Circuit in *Heininger* v. *Commissioner*, 133 F. 2d 567.

in this case the payments actually made to the witnesses should be allowed as ordinary and necessary business expenses.