RAYMOND BERTOLINI TRUCKING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Raymond Bertolini Trucking Co. v. Commissioner
Docket No. 15330-80.
United States Tax Court
T.C. Memo 1982-643; 1982 Tax Ct. Memo LEXIS 101; 45 T.C.M. (CCH) 44; T.C.M. (RIA) 82643; November 8, 1982. *101 Petitioner corporation was engaged in the excavation and hauling business during the years in question. In 1974, it was involved as subcontractor in the construction of a shopping center in Akron, Ohio. In 1975 petitioner's president was approached by a representative of the general contractor of the mall and informed that petitioner would be required to make certain payments to that representative in order to remain on the job. These "kickback" payments were continually solicited and paid up until 1977. Held, because there was no evidence that kickback payments in the nature of those made by petitioner were a customary practice in the excavating and earthmoving industry in the locality of petitioner's activities, such payments were not "ordinary" within the meaning of sec. 162(a), I.R.C. 1954, and therefore are not deductible. Held further, petitioner is liable for additions to tax pursuant to sec. 6651(a)(1) for failure to timely file its Federal income tax returns for the years in question. Samuel Goldman, for the petitioner. Richard S. Bloom, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated May 16, 1980, *102 respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: Taxable
Addition to tax
year ended
Deficiency
pursuant to sec. 6651(a)(1)
Sept. 30, 1976
$29,290
$7,322.50
Sept. 30, 1977
5,626
1,406.50
After concessions, the issues for consideration are (1) whether certain payments made by petitioner, a subcontractor in the dump trucking and excavating business, to, and on behalf of, an employee of a general contractor are deductible pursuant to section 162, I.R.C. 1954; and (2) whether petitioner is liable for additions to tax pursuant to section 6651(a)(1) for failure to timely file its Federal income tax returns for the years in question. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, the Raymond Bertolini Trucking Company, had its principal place of business in Akron, Ohio at the time of filing the petition herein. Petitioner, an Ohio corporation, filed its Federal income tax returns for the taxable years ended September 30, 1976 and September 30, 1977 with the Internal Revenue Service *103 Center, Cincinnati, Ohio. On July 1, 1977 petitioner filed its Federal income tax return for the taxable year ended September 30, 1976 after having been granted extensions until June 15, 1977 to file its tax return for that year. On November 6, 1978 petitioner filed its Federal income tax return for the taxable year ended September 30, 1977. It had received an extension to March 15, 1978 from the Internal Revenue Service to file its return for that year. Petitioner was organized in 1967 as the successor corporation to a sole proprietorship owned by Raymond Bertolini which began business in 1958. Its business consists of the excavation and hauling of earth and material by the use of earth moving equipment and dump trucks. Mr. Bertolini owns 75 percent of petitioner's stock and is its president. During 1974, petitioner rented equipment and performed services for a company named B.I.M. at the site of an enclosed mall-type shopping center known as the Rolling Acres Mall (hereinafter Rolling Acres), then under construction and located on Romig Road in Akron, Ohio. The general contractors on the project were Forest City Dillon, Inc. and F.C.E. Construction, Inc., both of which were *104 wholly owned subsidiaries of Forest City Enterprises, Inc. (hereinafter Forest City). B.I.M. had been engaged to do underground work and earth moving. Sometime thereafter, B.I.M. experienced difficulties and all of its equipment at the Rolling Acres site was repossessed by creditors. Nicholas Festa, who was employed by Forest City Dillon, Inc. and F.C.E. Construction, Inc. as executive vice-president, came to Akron from the Cleveland office of Forest City on the morning that he learned that B.I.M. had lost its equipment. Mr. Festa was in charge of construction at the Rolling Acres site and had authority to engage subcontractors and disburse construction funds to them. At that time, Mr. Festa requested petitioner to provide the necessary equipment and personnel to continue construction under the supervision of B.I.M. It was agreed by the parties that petitioner would bill Forest City on an hourly basis for use of the equipment and operating personnel. The Rolling Acres project was, up until that time, the largest job that petitioner ever had undertaken. In the course of carrying out this subcontract, petitioner's payroll was approximately $30,000 per week and petitioner was required *105 to make monthly payments on approximately $200,000 worth of equipment purchased during this time. Prior to the Rolling Acres job, no weekly payroll of petitioner had exceeded $5,000. Sometime after petitioner began invoicing Forest City for its work at Rolling Acres, Mr. Bertolini was approached by Mr. Festa and solicited to make "kickback" payments to Mr. Festa out of the payments received from Forest City. Mr. Bertolini understood Mr. Festa's solicitations to mean that his company could continue working on the Rolling Acres job site and be paid timely only if he kicked back the requested amounts to Mr. Festa. During the period in which petitioner was employed at the Rolling Acres site, it also did other subcontract work on an adjacent site being developed for retail stores by subsidiaries of Forest City on a bid/subcontract basis. All of those subcontracts were signed by Mr. Festa and were offered to petitioner upon condition that Mr. Bertolini make kickback payments to Mr. Festa. Petitioner made the payments as requested. After petitioner received a check in payment of one of its invoices, Mr. Festa would inform Mr. Bertolini of the amount of kickback he expected to receive. *106 This amount generally bore no constant relationship to the amount of the invoice. Mr. Bertolini either made the payments directly to Mr. Festa or made them on his behalf in the form of checks payable to Albert N. Metzger, Inc., a creditor of Mr. Festa. Petitioner acceded to Mr. Festa's demand for kickbacks and did not report Mr. Festa to the Forest City corporate officials because he was fearful that, if he approached a Forest City official with a complaint about Mr. Festa, the official himself might be a participant in the kickback scheme. Mr. Bertolini believed that he could not afford to take the risk of losing the Forest City job because of the relatively vast sums of money that he was required to pay out for labor and equipment. His financial predicament was made even more precarious when Forest City refused to pay an invoice issued in September of 1975 for an amount in excess of $340,000. [1]
The first amount paid to Mr. Festa by petitioner was $32,186.91 by check dated September 17, 1975 and payable to Albert N. Metzger, Inc. *107 This payment is not the subject of dispute in this case. During its taxable year ended September 30, 1976, petitioner paid Mr. Festa four separate amounts in cash aggregating $22,500 and delivered three checks payable to Albert N. Metzger, Inc. also aggregating $22,000 for a total of $44,500. During its taxable year ended September 30, 1977, petitioner paid Mr. Festa $35,885 in cash. Kickback payments made payable to Albert N. Metzger, Inc. over this period totaled $54,186.91. At sometime prior to January 27, 1977, when Mr. Bertolini was financially unable to make kickback payments requested by Mr. Festa, Mr. Festa compelled Mr. Bertolini to issue a note payable to him in the amount of $30,000. On January 27, 1977, February 4, 1977, and February 15, 1977, Mr. Bertolini paid Mr. Festa $12,000, $9,000 and $9,000, respectively, and Mr. Festa gave petitioner receipts for each of these payments. Although the last payment was made after Mr. Festa was no longer employed by Forest City or its subsidiaries, petitioner nonetheless paid Mr. Festa because he believed Mr. Festa had a legally enforceable right to the amount due to the existence of the promissory note. Petitioner continued *108 to perform services for Forest City after Mr. Festa's employment relationship was terminated. In the early part of 1977, petitioner consulted with his attorney and accountant regarding the reporting requirements of the Internal Revenue Service with respect to the payments to Mr. Festa. Both advised him that a Form 1099 should be filed for all payments. A Form 1099 was filed by petitioner for the 16-month period September 1975 to December 31, 1976 for petitioner's taxable year ended September 30, 1977, which was filled in to show in the box labeled "Commissions and Fees to Nonemployees (No Form W-2 Items)" the sum of $82,571.91 as paid to Mr. Festa. Another Form 1099 was filed in 1978 for the payments of $30,000 to Mr. Festa for the calendar year 1977. On March 12, 1980 a Federal grand jury sitting in the Northern District of Ohio indicted Mr. Festa on four counts of violating section 7201, U.S.C., for filing false and fraudulent income tax returns for the calendar years 1973, 1975, 1976 and 1977. The true bill charged that Mr. Festa, in each of the years, solicited commissions and kickbacks from contractors of his employer and failed to include such amounts in taxable income. *109 The amount not included in income for each year was alleged as follows: 1973, $26,500; 1975, $326,940.75; 1976, $53,809; 1977, $27,750. On March 20, 1980 Mr. Festa entered a plea of not guilty on all counts. On August 8, 1980 Mr. Festa's motion to withdraw his plea of not guilty to counts One and Two was granted and Mr. Festa was fined $10,000 on each count, totaling $20,000, and placed on probation for a period of 3 years on each count, to run concurrently, with the fine to be paid during the period of probation. Counts Three and Four of the indictment were dismissed. During the years in issue, petitioner made no kickback payments other than those referred to above. During Mr. Bertolini's career in trucking and excavation, he made no kickback payments other than those referred to above. No kickback payments were made by petitioner to any other individual at Forest City than Mr. Festa. Ralph Delgreco is, and during the years in question, was the vice-president of petitioner. Mr. Delgreco has been employed by petitioner for 16 years. During that time Mr. Delgreco had never participated in any kickback payments other than those referred to above. None of the payments made *110 to Mr. Festa by petitioner were at the time and under the circumstances in which made illegal under Ohio law or the laws of the United States in the sense that such payments did not subject petitioner to criminal penalty nor the loss of a license or privilege to engage in its trade or business. Petitioner deducted on its Federal income tax return for the taxable year ended September 30, 1976 kickback payments in the amount of $44,500 as "Subcontract--Construction. " Petitioner deducted on its Federal income tax return for its taxable year ended September 30, 1977, the kickback payments made during that year as follows: Subcontract--Construction, $5,885; Commissions, $30,000. In his statutory notice, respondent disallowed these deductions in their entirety. OPINION The first issue for decision is whether the payments made by petitioner to Mr. Festa are deductible trade or business expenses pursuant to section 162. Petitioner argues that the disputed payments fall neatly within section 162(c)(2), which provides as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (c) Illegal Bribes, Kickbacks, and Other Payments.-- (2) Other Illegal Payments.--No deduction shall be allowed under subsection *111 (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud). The parties have agreed that the payments herein did not constitute illegal bribes, illegal kickbacks or other illegal payments such that they would be automatically disallowed under the provisions of section 162(c)(2).Petitioner argues that, because it has been agreed that such payments were *112 not illegal under any law of the United States or under state law, it follows that they are deductible under section 162(c)(2). This contention is mistaken in that it ignores the prefatory language to section 162(c)(2) which states that "[n]o deduction shall be allowed under subsection (a)," indicating that the requirements of subsection (a) of section 162 must be met as a prerequisite to deductibility under section 162(c)(2). This interpretation is borne out by the regulations, which provide that "[a] deduction for an expense paid or incurred after December 30, 1969, which would otherwise be allowable under section 162 shall not be denied on the grounds that allowance of such deduction would frustrate a sharply defined public policy." Section 1.162-1(a), Income Tax Regs. Thus it is clear that the deductibility of a "kickback payment" hinges not only on avoiding the disallowance provisions of section 162(c)(2), but also is dependent upon satisfaction of the general requirements of section 162(a). See Boucher v. Commissioner,77 T.C. 214, 217 (1981). Generally, section 162(a) allows as a deduction all "ordinary and necessary expenses" paid during the taxable year in the carrying *113 on of a trade or business. Our analysis therefore focuses on whether the payments made by petitioner to Mr. Festa were "ordinary and necessary" within the statutory meaning of that phrase. The Tax Reform Act of 1969 added section 162(c)(2), which was the predecessor to the present section 162(c)(2). As originally promulgated, deductions for illegal bribes or kickbacks to persons other than governmental officials were disallowed if the payor taxpayer was "convicted of making a payment * * * which is an illegal bribe or kickback." [2] In the Revenue Act of 1971, the current section 162(c)(2) was enacted in order to restrict further the deductibility of illegal bribes and kickbacks. [3] *114 Thus, under current law, it is no longer necessary that the payor be convicted for making the payment. Now, all that is necessary is that the payor be subject to a criminal penalty or the loss of license or privilege to engage in a trade or business as a result of such payment. See section 162(c)(2). However, even prior to the enactment of section 162(c)(2), if the payor had not been convicted for making an illegal kickback or bribe, a deduction was disallowed where such payment was not "ordinary or necessary." See, e.g., diamond v. Commissioner,56 T.C. 530, 543 (1971), affd. 492 F.2d 286 (7th Cir. 1974). Because the "ordinary and necessary" requirement has carried over into current law, such cases have continuing vitality under the present section 162(c)(2). First, we address whether the payments made by petitioner during the years in question were "ordinary." In Welch v. Helvering,290 U.S. 111, 113-114 (1933), the Supreme Court stated that what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. * * * The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help *115 to stabilize our judgment, and make it certain and objective.The instance is not erratic, but is brought within a known type. Again, in Deputy v. du Pont,308 U.S. 488, 495 (1940), the Supreme Court stated that "[o]rdinary has the connotation of normal, usual, or customary." It reiterated that although the expense may be unique in the taxpayer's lifetime, the transaction giving rise to it "must be of common or frequent occurrence in the type of business involved." Deputy v. du Pont,supra at 495. The issue of whether payments made in the present context, that is, for business favors conferred by the beneficiary of such payments, are deductible business expenses was the issue in the case of Lilly v. Commissioner,343 U.S. 90 (1952). In that case, the taxpayers involved were engaged in the optical business in the States of North Carolina and Virginia. Pursuant to agreements reflecting an established and wide-spread practice in that industry, they paid to the respective doctors who prescribed eyeglasses sold by such taxpayers one-third of the retail sales price received upon the sale of such glasses. The case originated in the Tax Court, Lilly v. Commissioner,14 T.C. 1066 (1950), *116 where the deductions claimed for the payments made to the respective doctors were disallowed on the grounds that such payments were contrary to public policy. In rejecting the application of this test to the factual situation therein involved as not being mandated by the statute, the Supreme Court stated that the deductibility of such payments should be tested under the traditional "ordinary and necessary" standard. In so applying that test, the Court stated that-- [t]he payments to the doctors were made by petitioners monthly in the regular course of their business.Under the long-established practice in the optical industry in the localities where petitioners did business, these payments in 1943 and 1944, were normal, usual and customary in size and character. The transactions from which they arose were of common or frequent occurrence in the type of business involved. They reflected a nationwide practice. Consequently, they were "ordinary" in the generally accepted meaning of that word. [Lilly v. Commissioner,343 U.S. at 93.] Thus, a necessary touchstone for the deductibility of a "kickback" payment is that such payment must be "of common or frequent occurrence in the type *117 of business involved." In Diamond v. Commissioner,56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974), this Court addressed the deductibility of payments made by a mortgage broker to certain persons, in their individual capacities, who were in control of the savings and loan associations from which the taxpayer obtained mortgages for his clients. The taxpayer in Diamond deducted the payments as business expenses under the designation "consultants' fees." We denied the claimed deduction on the ground that the taxpayer had failed to establish that the payments were in any way customary or normal in the savings and loan industry. Thus, the fact that the payments were "appropriate and helpful" to him in his particular trade or business is not a relevant consideration in determining whether such payments were "ordinary" in the trade or business in which the taxpayer is engaged. In United Draperies, Inc. v. Commissioner,41 T.C. 457, 463 (1964), affd. 340 F.2d 936 (7th Cir. 1964), we stated that "[t]o be ordinary within the meaning of section 162, *118 expenditures must be common in the taxpayer's dealings or of frequent occurrence in the type of business in which the taxpayer is engaged." In United Draperies, the payments in question were found to be kickback payments made in order to secure the business of the payee's employers. We found that the taxpayer had failed to show that it normally made such payments or that such payments were commonly made in the kind of business in which it was engaged. Thus, the payments were not "ordinary," as required by section 162(a). We believe that under the law as it stands, petitioner is not entitled to a deduction in the instant case since it did not establish that the payments involved were "ordinary" in the statutory sense of the term.
In Frederick Steel Co. v. Commissioner,42 T.C. 13, 25 (1964), revd. on other grounds 375 F.2d 351 (6th Cir. 1967), we found that payments made in the nature of commercial bribes by the taxpayer to the purchasing agent of his primary customer were not deductible because they were not "ordinary" expenses. In reaching such result, we concluded that there was not reliable evidence that other similar arrangements or practices were common in the relevant industry. *119 Likewise in Reffett v. Commissioner,39 T.C. 869 (1963), this Court disallowed deductions claimed for payments made by a taxpayer who sued the United Mine Workers of America for damages caused by the destruction of his coal mine and equipment. The payments were made to two witnesses pursuant to an agreement whereby they were to receive on a contingency basis 10 percent of any recovery received by him in the suit. We disallowed the claimed deductions, finding that the payments were not only unique to the taxpayer but also to the "group [or] community" of which he was a part. Reffett v. Commissioner,supra at 879. In the instant case, no evidence has been elicited to the effect that kickback payments in the nature of those made during the years in question by petitioner to Mr. Festa were a customary practice in the excavating and earth moving industry in the locality of petitioner's activities. In fact, both Mr. Bertolini and Mr. Delgreco testified that they had never participated in or experienced any such arrangement over the long course of their career in hauling and excavation. Neither had they heard of any such arrangement being perpetrated by anyone else in the industry during *120 this period. Thus, we must take the record as we find it even while recognizing the inherent difficulty in establishing industry practice where payments of the nature here in issue are concerned. A court does not have the prerogative of relying on suspicions. Accordingly, in the absence of any proof whatsoever that the payments made by Mr. Bertolini to Mr. Festa were in any way customary or normal in the dumping or excavating industry, we must hold that such payments were not "ordinary" within the meaning of section 162(a) and therefore are not deductible thereunder. The second issue in this case is whether petitioner is liable for additions to tax pursuant to section 6651(a)(1) for failure to timely file its Federal income tax returns for the years in question. Petitioner bears the burden of proving that it is not liable for such additions. Welch v. Helvering,290 U.S. 111 (1933). Petitioner made no effort, either at trial or on brief, to establish that its failure to file timely returns during the years at issue was the result of reasonable cause. Accordingly, respondent's determination of additions are sustained. To reflect the foregoing, Decision will be entered for the *121 respondent.
Footnotes
1. Forest City's stated refusal to pay petitioner was based upon its claim that the bonding company which bonded B.I.M. was responsible for such payment.↩
2. Sec. 902(c)(2) of Pub. L. 91-172, 83 Stat. 710, Dec. 30, 1969 (qualified effective date rule in sec. 902(c) of Pub. L. 91-172). ↩
3. Sec. 310(a)(1) of Pub. L. 92-178, 85 Stat. 525, Dec. 10, 1971, effective with respect to payments after Dec. 30, 1969.