# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 01-2292

_____

Midwest Motor Sports, doing
business as Elliott Power Sports,
Inc., a South Dakota corporation,

        Appellee,

    v.

Arctic Cat Sales, Inc., a Minnesota
corporation,

        Appellant,

A-Tech Cycle Service, Inc.,

        Appellee,

Roger W. Damgaard; Timothy R.
Shattuck, Attorneys for Arctic Cat
Sales, Inc.,

        Appellants.

* * * * * * * * * * * * * * * * * * * * * * * *

Appeals from the United States
District Court for the
District of South Dakota.

[PUBLISHED]

_____

No. 01-2423

_____

Midwest Motor Sports, Inc., a
South Dakota corporation doing
business as Elliott Power Sports,

        Appellant,

v.                                          \*

                                            \*

Arctic Cat Sales, Inc., a Minnesota        \*
corporation,                                \*

                                            \*

      Appellee.                       \*


_____

     No. 01-2424

_____


Arctic Cat Sales, Inc., a Minnesota        \*
corporation,                                \*

                                            \*

      Appellee                        \*

                                            \*

v.                                          \*

                                            \*

A-Tech Cycle Service, Inc.,                 \*

                                            \*

      Appellant.                      \*


_____


Submitted: March 15, 2002
Filed: October 20, 2003

_____

Before HANSEN,[1] Chief Judge, JOHN R. GIBSON, Circuit Judge, and GOLDBERG,[2] Judge.

_____

HANSEN, Circuit Judge.

This case arose out of a dispute between Arctic Cat Sales, Inc. (Arctic Cat), a snowmobile manufacturer, and two South Dakota Arctic Cat dealers, Midwest Motor Sports, Inc., d/b/a/ Elliott Power Sports (Elliott), and A-Tech Cycle Service, Inc. (A-Tech). Elliott sued Arctic Cat, asserting that Arctic Cat had violated South Dakota franchise law when it terminated Elliott's Arctic Cat franchise and established A-Tech as a new franchisee in the same city as Elliott. During discovery, Arctic Cat's counsel hired a private investigator to visit the Elliott and A-Tech franchises and to surreptitiously record conversations with each dealer's employees. Subsequently, the district court[3] entered an order sanctioning Arctic Cat's attorneys for unethically tape recording parties represented by opposing counsel. As a sanction, the district court excluded from evidence the tape recordings taken by the investigator, as well as any evidence obtained as a result of the recordings. The parties settled the franchise termination case prior to trial; however, they reserved the question of whether additional sanctions should be imposed. The district court then entered a written order denying further sanctions and explaining in detail the basis for its exclusionary order. We affirm the imposition of the evidentiary sanctions, and we decline to hold that monetary sanctions should have been imposed as well.

_____

[1]The author of the opinion stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

[2]The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

[3]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota.

During the pendency of the franchise litigation suit, the attorneys for Arctic Cat, Roger Damgaard and Timothy Shattuck, retained the services of a private investigator, Adrian Mohr. Mohr was formerly a special agent with the FBI for nearly 30 years. The attorneys requested that Mohr visit the Elliott showroom to determine what products Elliott's salespersons were promoting and what equipment was on display in the showroom in order to ascertain which brand of snowmobile was selling best, and to determine whether Elliott had been financially burdened by the loss of the Arctic Cat franchise. Mohr wore a recording device to memorialize the conversations. The Arctic Cat attorneys did not provide Mohr with a script of what to ask during his showroom visits but indicated certain topics that they wanted Mohr to cover in the conversations. Mohr had written in his notes of this meeting with the attorneys the phrases "ADMIT SKIDOO & OR YAMAHA BEST" and "bad mouth A-Tech" as possible subjects to elicit during his conversations. (Elliott's App. at 150.) He was also provided the name of "Jim LeTendre," who was identified by the Arctic Cat attorneys as Elliott's sales manager. Mohr's deposition testimony reveals that while he was not supposed to try to talk to LeTendre, if he encountered LeTendre, he was supposed to ask LeTendre whether Elliott could service an Arctic Cat snowmobile if Mohr bought one elsewhere. This evidence demonstrates that Arctic Cat's attorneys were willing to let their investigator talk with one who had managerial responsibility in the organization represented by opposing counsel and substantially undercuts Arctic Cat's assertion that the investigator was instructed only to talk to low-level employees. However, Mohr never encountered LeTendre during his visits to the Elliott showroom.

Mohr visited the Elliott showroom on November 12, 1999, and again on December 28, 1999, posing as a customer and intending to elicit admissions from an Elliott salesman. Mohr asked the salesman, "Bill," why Elliott no longer carried the Arctic Cat line of snowmobiles, if Elliott was allowed to sell a 1999 Arctic Cat that

it had for sale, and if Elliott could obtain parts and provide service for an Arctic Cat.

On November 11, 1999, Mohr and his wife--who provided "companionship and cover"--visited A-Tech's showroom and posed as customers. The Arctic Cat attorneys instructed Mohr to record anything that an A-Tech representative might say about the lawsuit. Upon entry into the dealership, Mohr was approached by Jon Becker, the president and owner of A-Tech. Mohr knew that attorney Daniel Lias then represented Becker as one interested in the Arctic Cat/Elliott litigation, but Mohr was undeterred and proceeded to question Becker about the Arctic Cat snowmobile line. Mohr's interviewing of the president and owner of A-Tech raises a reasonable inference that he had not been instructed to avoid questioning management personnel.

Mohr provided Arctic Cat's attorneys with copies of his recordings and snowmobile brochures obtained during his several showroom visits. Contemporaneously with the time that Mohr was visiting Elliott and A-Tech, Arctic Cat's attorneys made a Federal Rule of Civil Procedure 34 Request for Inspection to Elliott's counsel, Steven Johnson, and to A-Tech's counsel, Daniel Lias, asking to inspect, photograph, and videotape the Elliott and A-Tech dealerships.

In his deposition, Mohr acknowledged that he was aware that a lawsuit was pending between Arctic Cat and Elliott, and that both Elliott and A-Tech were represented by counsel. However, Mohr failed to disclose to either Elliott or A-Tech that he was visiting both dealers' showrooms at the behest of Arctic Cat's attorneys or that he was wearing a recording device. Mohr further admitted that his purpose in visiting the snowmobile dealers was to "elicit evidence in a pending civil case on behalf of the lawyers that hired" him. (Arctic Cat's App. at 9.) Mohr questioned the Arctic Cat attorneys as to whether the tape recording of these conversations between represented parties was legal. They assured him that his conduct was legal but did not tell him whether his conduct was ethical, nor did they discuss with him the ethical rules governing his conduct as their agent.

Arctic Cat filed a motion to disqualify Elliott's counsel, Mr. Johnson, due to an alleged conflict of interest under Rule 1.7 of the Rules of Professional Conduct. Elliott and A-Tech filed motions for sanctions against Arctic Cat's attorneys for their use of Mohr to secretly obtain information about the dealerships in anticipation of trial. The district court denied Arctic Cat's motion to disqualify Mr. Johnson and granted the motions for sanctions. As a sanction, the district court excluded Mohr's audio recordings and any evidence gleaned from those recordings. Arctic Cat and its counsel appeal the district court's imposition of the evidentiary sanctions and its refusal to disqualify Mr. Johnson. Elliott and A-Tech appeal the district court's denial of their motions for monetary sanctions against Arctic Cat's counsel.

II.

A. Communications with Represented Parties and the Use of Audio Recordings

Arctic Cat contends that the district court erred in imposing evidentiary sanctions for its counsel's violation of the South Dakota Rules of Professional Conduct. We review the district court's imposition of sanctions for violating the ethical rules for an abuse of discretion. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990).

> Acts or omissions by an attorney, individually or in concert with any other person or persons, which violate the attorney's oath of office or the Rules of Professional Conduct, as adopted by rule by the Supreme Court, or any other disciplinary rules adopted by the Supreme Court, shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship.

S.D. Codified Laws § 16-19-32 (Michie 1995). South Dakota has adopted the American Bar Association's Model Rules of Professional Conduct. See In re

<u>Discipline of Dorothy</u>, 605 N.W.2d 493, 499 (S.D. 2000) (acknowledging the adoption of the ABA's Model Rules of Professional Conduct). Therefore, we turn to the Model Rules for guidance.

Rule 4.2 provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Under the test set out in the Model Rules, an organization's employee is considered to be represented by the organization's lawyer, and is covered by the prohibition in Rule 4.2, if the employee meets any one of the following three criteria: (1) he has managerial responsibility in the represented organization, (2) his acts or omissions can be imputed to the organization for purposes of civil or criminal liability, or (3) his statements constitute admissions by the organization. Model Rules of Prof'l Conduct R. 4.2 cmt. 7.

Investigator Mohr made personal contact with Jon Becker, A-Tech's president and owner. Under the Rule, it clearly would have been unethical for Arctic Cat's attorneys to communicate with Becker, a "critical" nonparty witness with ultimate managerial responsibility for A-Tech, about A-Tech's sales volumes and practices without first obtaining permission from A-Tech's attorney, Daniel Lias. The subject of the representation was the Arctic Cat/Elliott litigation, of which a critical portion was Elliott's expert's million-dollar damages estimate. Because every Arctic Cat snowmobile sold by A-Tech was a machine not sold by Elliott, the damages estimate could have been challenged in part by how much Arctic Cat business A-Tech was actually doing.

Arctic Cat's attorneys attempt to shield themselves from responsibility by "passing the buck" to Mohr. They allege that they directed Mohr to speak only to low-level salespeople for the purpose of becoming familiar with the Arctic Cat line. Even if these factual assertions were true, lawyers cannot escape responsibility for the wrongdoing they supervise by asserting that it was their agents, not themselves, who committed the wrong. Although Arctic Cat's attorneys did not converse with Becker themselves, the Rules also prohibit contact performed by an investigator acting as counsel's agent. See Model Rules of Prof'l Conduct R. 5.3. "Since a lawyer is barred under Rule 4.2 from communicating with a represented party about the subject matter of the representation, she may not circumvent the Rule by sending an investigator to do on her behalf that which she is herself forbidden to do." ABA Comm. on Ethic and Prof'l Responsibility, Formal Op. 95-396 ("[I]f the investigator acts as the lawyer's 'alter ego,' the lawyer is ethically responsible for the investigator's conduct."). In other words, an attorney is responsible for the misconduct of his nonlawyer employee or associate if the lawyer orders or ratifies the conduct. Model Rules of Prof'l Conduct R. 5.3. Accordingly, we conclude that Arctic Cat's attorneys are ethically responsible for Mohr's conduct in communicating with Becker as if they had made the contact themselves.

Mohr also made personal contact with Elliott's salesman, "Bill." This contact necessarily implicates the third criterion of Rule 4.2. We conclude, as the district court did, that the discussions with "Bill" were intended to elicit admissions to be used against Elliott at trial, the subject of both Arctic Cat's counsel's and Mr. Johnson's representation. Indeed, it is apparent to us that Arctic Cat's counsel would have attempted to present "Bill's" statement that Elliott made a business decision to drop the Arctic Cat line under the party admission exception to the hearsay rule.[4]

---

[4]The exception provides that a "statement is not hearsay if ... (2)[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D).

While we recognize that some courts have been hesitant to equate the ethical rules' use of "admissions" to the use of the same concept in Federal Rule of Evidence 801, we note that those courts were applying different state evidentiary rules or ethical rules than the ones that govern in South Dakota. Alternatively, the circumstances in those cases did not invoke the same threat to the attorney-client relationship protected by Rule 4.2 that exists in this case. Where, as here, attorneys elicit specific admissions from an opponent's low-level employees that the attorneys know would be advised against by the employer's counsel, we have no doubt that the ethical considerations in Rule 4.2 apply.

Although the violations of Rule 4.2 alone would be sufficient to impose the evidentiary sanctions at issue here, they are further justified by the specific circumstances surrounding those violations. While there is no evidence that Arctic Cat's counsel directly contacted Becker or "Bill," the Model Rules of Professional Conduct prohibit a lawyer from violating the Rules "through the acts of another." Model Rules of Prof'l Conduct R. 8.4(a). Mohr's interviews took place under false and misleading pretenses, which Mohr made no effort to correct. Not only did Mohr pose as a customer, he wore a hidden device that secretly recorded his conversations with Becker and "Bill."

Model Rule 8.4(c) prohibits "conduct involving dishonesty, fraud, deceit or misrepresentation." The district court found that Mohr's conduct in making secret recordings of his conversations with Becker and "Bill" necessarily involved deceit or misrepresentation. In reasoning that it is unethical for an attorney or investigator to record conversations without the consent of the other party, the district court relied on cases from other jurisdictions and on the ABA Committee on Ethics and Professional Responsibility's Formal Opinion 337 (1974) ("[N]o lawyer should record any conversation whether by tapes or other electronic device, without the consent or prior knowledge of all parties to the conversation.").

After the district court issued its opinion, the ABA published a new Formal Opinion which reverses its position in Formal Opinion 337 and states that a lawyer who electronically records a conversation without the knowledge of the other party or parties to the conversation does <u>not</u> necessarily violate the Model Rules of Professional Conduct. <u>See</u> ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 422 (2001). The ABA advised that "[a] lawyer may not, however, record conversations in violation of the law in a jurisdiction that forbids such conduct without the consent of the parties, nor falsely represent that a conversation is not being recorded." <u>Id.</u> The laws of South Dakota permit recording by one party to a conversation without the knowledge or consent of the other party. <u>South Dakota v. Braddock</u>, 452 N.W.2d 785, 788 (1990).

Nevertheless, conduct that is legal may not be ethical. The ABA suggests that nonconsensual recordings be prohibited "where [the recording] is accompanied by other circumstances that make it unethical." ABA Comm. on Ethic and Prof'l Responsibility, Formal Op. 01-422. Mohr's unethical contact with Becker and "Bill" combined with the nonconsensual recording presents the type of situation where even the new Formal Opinion would authorize sanctions.

The duty to refrain from conduct that involves deceit or misrepresentation should preclude any attorney from participating in the type of surreptitious conduct that occurred here. As Mohr's deposition testimony makes clear, his covert recordings were conducted with Arctic Cat's attorneys' knowledge and approval. In addition, there is evidence in the record that the course of conduct by Mohr was not only ratified by Arctic Cat's counsel, but that it was directed by them. Arctic Cat's attorneys admit that the intent behind Mohr's retention was to determine whether Elliott was continuing to sell and service Arctic Cat snowmobiles in order to rebut Elliott's damages expert at trial. (Arctic Cat's Br. at 35.) Arctic Cat's counsel contends that Mohr's visit to A-Tech was merely to become familiar with the Arctic

Cat snowmobile line. The evidence does not support this assertion. The record shows that while Mohr did indeed visit two other Arctic Cat dealers for purposes of familiarization, only his visit to A-Tech was recorded. We conclude that Mohr's purpose in visiting A-Tech was to elicit specific admissions from A-Tech's employees about A-Tech's sales of Arctic Cat snowmobiles because Elliott's damages were impacted by A-Tech's sales and service of the Arctic Cat line--information that could have been obtained properly through the use of formal discovery techniques.

Arctic Cat was using Mohr's undercover ruse to elicit damaging admissions from Elliott's employee and A-Tech's president to secure an advantage at trial. Such tactics fall squarely within Model Rule 8.4(c)'s prohibition of "conduct involving dishonesty, fraud, deceit or misrepresentation." Arctic Cat contends that it only retained Mohr after traditional means of discovery had failed. Arctic Cat's attorneys may have become frustrated with their opposing counsel's refusal to cooperate, but that frustration does not justify a self-help remedy. It is for this very reason that our system has in place formal procedures, such as a motion to compel, that counsel could have used instead of resorting to self-help remedies that violate the ethical rules.

## B. Conflict of Interest

Arctic Cat further argues that the district court abused its discretion by denying its motion to disqualify Elliott's counsel, Steven Johnson, due to a conflict of interest. Arctic Cat claims that Mr. Johnson should have been disqualified because an associate in his law firm, Chad Swenson, was acting as general counsel for A-Tech throughout Arctic Cat's litigation with Elliott. When one of A-Tech's owners, a Mr. Smith, sold his interest in A-Tech pursuant to a stock redemption agreement, it was Mr. Swenson who authored and transmitted a letter request signed by the selling owner to Arctic Cat's floor plan financing agent, Deutsche Financial Services, asking that the selling owner be removed as a personal guarantor of A-Tech's obligations.

The transmittal letter's subject line over Mr. Swenson's signature and on the Johnson law firm's stationery is "Arctic Cat Products." When Deutsche then put A-Tech's Arctic Cat snowmobile order on hold, it was Mr. Swenson who assisted Mr. Becker in furnishing Deutsche with Mr. and Mrs. Becker's additional personal guarantees to support Deutsche's continued financing of A-Tech's inventory of Arctic Cat snow machines. However, he submitted an affidavit stating that he never acted as A-Tech's attorney in any matters related to Arctic Cat. Mr. Johnson's brief echos Mr. Swenson's assertion that their law firm had never represented A-Tech on any matters related to Arctic Cat.

Rule 1.7 of the Rules of Professional Conduct prohibits a lawyer from representing a client if the representation of that client will be either directly adverse to another client or materially limited by the lawyer's own interests.[5] "The decision to grant or deny a motion to disqualify an attorney rests in the discretion of the [district] court, and we will reverse this determination only upon a showing of abuse of that discretion." Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1154 (8th Cir. 1999)

_____

[4]Rule 1.7 of the Model Rules provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consent[s] after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(internal quotations omitted and alteration in original). "Because of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict judicial scrutiny." Harker v. Comm'r, 82 F.3d 806, 808 (8th Cir. 1996) (internal quotations omitted). The district court determined that both Don Elliott, president of Midwest Motor Sports, and Jon Becker, president of A-Tech, voluntarily waived any conflict of interest that may have existed. While the evidence indicates that A-Tech did not consult with attorneys from the Johnson law firm specifically about Arctic Cat franchise matters, it appears to us from the record that Mr. Swenson did serve A-Tech's interests when he assisted both Mr. Smith and Mr. Becker, A-Tech's principals, in their dealings with Arctic Cat's financier, certainly an Arctic Cat related matter--contrary to his affidavit and Mr. Johnson's brief. Counsel's failure to recognize the inconsistency between Mr. Swenson's action and his sworn statement is troubling to us. That being said, we cannot say that the district court abused its discretion in failing to disqualify Mr. Johnson given that both clients consented to the representation.

## C. Fees and Costs

Having determined that the district court properly disallowed Mohr's recordings or any evidence gleaned from those recordings to be introduced into evidence, we now turn to Elliott and A-Tech's argument advanced in their appeals that the district court abused its discretion by failing to award monetary sanctions. Prior to this case, the law in South Dakota was unsettled on the question of whether using an investigator to elicit admissions from opposing parties' employees was unethical. Furthermore, as demonstrated by the ABA's change in position, the ethical rules related to secret recording by lawyers and investigators were evolving. Thus, we conclude that the district court's imposition of solely evidentiary sanctions was appropriate and adequate. We remind all members of the Bar that the obligations and duties of lawyers in our society demand conduct of the highest moral character. We

-13-

believe, as did the district court, that because South Dakota law was not fully developed, Arctic Cat's lawyers' error in determining what their investigator could do should not result in a monetary sanction against them or their client.

## III.

The judgment of the district court is affirmed.

_____