2013 COA 112M

JUST IN CASE BUSINESS LIGHT-
HOUSE, LLC, a Colorado limited liabil-
ity company, Plaintiff–Appellee,

v.

Patrick MURRAY, Defendant–Appellant.

Court of Appeals No. 12CA1261

Colorado Court of Appeals,
Div. IV.

Announced July 18, 2013

As Modified on Denial of Rehearing
Aug. 15, 2013

Arapahoe County District Court No. 09CV823, Honorable Charles M. Pratt, Judge.

Cristiano Law, LLC, Francis V. Cristiano, Greenwood Village, Colorado, for Plaintiff–Appellee.

McGloin, Davenport, Severson and Snow, PC, Michael M. McGloin, Krista L. Tushar, Karl D. Kaesemeyer, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE WEBB

¶ 1 This case involves alleged fraud in the negotiated termination of agreements concerning a commission payable for facilitating the sale of a business. Defendant, Patrick Murray, appeals the judgment entered on a jury verdict against him on the fraudulent misrepresentation and concealment claim of plaintiff, Just In Case Business Lighthouse, LLC. We conclude that a limited remand is required for the trial court to address striking one of plaintiff's witnesses as a sanction for improperly agreeing to compensate that witness with a percentage of plaintiff's recovery, which is a question of first impression in Colorado.

## I.  Facts

¶ 2 Plaintiff, which is solely owned and operated by Joseph Mahoney, entered into two successive agreements (Harvest Agreements) with Pearl Development Company. Under these agreements, plaintiff acted as Pearl's agent in seeking a buyer for the company and in posturing it for sale. Plaintiff received a $5,000 monthly fee for consulting services, and would be paid a commission on any sale that occurred during the terms of the agreements or within a tail period thereafter.

¶ 3 Pearl and Epic Energy Resources, Inc. entered into a letter of intent, without plaintiff's knowledge, during the term of the second Harvest Agreement. Defendant, who was at that time president of Pearl, contacted Mahoney about ending the Harvest Agreements, but did not tell him about the letter of intent. Mahoney and defendant had two telephone conversations concerning the provisions for termination. Mahoney recorded both conversations, which were the primary basis for the fraud claim against defendant.

¶ 4 Shortly after these conversations, plaintiff and Pearl entered into the Termination Agreement. This agreement provided plaintiff with a one-time payment of $100,000, but excluded it from any commission if Epic, among other named entities, bought Pearl. Pearl made this payment. Five months later, the sale of Pearl to Epic closed.

¶ 5 When plaintiff learned of the closing, it brought this action alleging that Pearl had breached the Harvest Agreements and that defendant, Bret Rhinesmith and Curtis Good (both owners of Pearl), acting on behalf of Pearl had deceived it by "misrepresenting, concealing, and/or failing to disclose the fact that Epic had manifested a specific and well-defined, interest in and intent to purchase Pearl, thereby inducing plaintiff to sign the termination agreement...." Plaintiff sought damages including "Plaintiff's entitlement to a commission pursuant to the applicable commission or 'success fee' in the first Harvest Agreement ($1,550,000), less the $100,000 Plaintiff was paid pursuant to the 'termination agreement.'"

¶ 6 Pearl took bankruptcy. Rhinesmith and Good settled with plaintiff. The jury awarded damages of $1,691,000 against defendant, which the trial court reduced to $563,610.30 based on the comparative fault of Rhinesmith and plaintiff.

## II.  Testimony of Preston Sumner

A. The Trial Court Did Not Err in Rejecting a Per Se Rule That Would Preclude Sumner's Testimony Because His Compensation Was Contingent on the Outcome of the Case.

¶ 7 Plaintiff hired Preston Sumner, a longtime acquaintance of Mahoney, as an advisor to develop its case. Sumner spent between 500 and 1,000 hours, over four years, primarily examining business records and preparing the summaries addressed in section III below. Sumner's agreement with plaintiff provided that he would receive ten percent of any judgment or settlement obtained.

¶ 8 Based on this contingent interest, defendant moved in limine to preclude Sumner from testifying as either an expert or a fact witness. (Defendant also objected to Sum-

ner's testimony as a summary witness, which is discussed in section IIC.) The court ruled that Sumner could testify only as a fact witness, but otherwise denied defendant's motion.[1]

¶ 9 This ruling raises a question of first impression in Colorado: does compensating a fact witness on a contingent basis require the exclusion of that witness's testimony? Although we disapprove of compensating a fact witness on a contingent basis, we reject such a per se rule. Instead, we conclude that contingent compensation requires the trial court to determine whether the witness should be stricken as a sanction. Here, because the trial court misstated the law on contingent compensation of witnesses, did not rule on the propriety of a sanction, and lacked the benefit of our holding, a limited remand is required.

### B. Contingent Compensation of a Fact Witness

¶ 10 Ethical rules have long prohibited lawyers from compensating witnesses on a contingent basis. *See* ABA Model Code of Professional Responsibility, DR 7–109(C) (1969) ("A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case.").[2] In *People v. Belfor*, 197 Colo. 223, 226, 591 P.2d 585, 587 (Colo.1979), an attorney was disciplined under DR 7–109, among other rules, for arranging payment of a judgment against the witness "meant to be a gift to [the witness], contingent upon his favorable testimony, or a loan with a contingency that it would be forgiven if he testified favorably." The supreme court explained that "[i]t is

both illegal and against public policy to pay or tender something of value to a witness in return for his testimony." *Id.*

¶ 11 At all times pertinent to this case, Colo. RPC 3.4(b) provided that a lawyer shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." Comment [3] differs from the ABA Model Rule by stating, "[i]t is improper to pay *any witness* a contingent fee for testifying." (Emphasis added.)

¶ 12 Although no other Colorado case has addressed payment of a contingent fee to a fact witness, both the supreme court and a division of this court have disapproved of such compensation for an expert witness. In *City & Cnty. of Denver v. Board of Assessment Appeals*, 947 P.2d 1373, 1379 (Colo. 1997), the supreme court vacated decisions in valuation proceedings because the appraisers who had testified were salaried employees of appraisal firms "that had executed contingent fee agreements with taxpayer clients." [3] It explained: "If the expert's payment is contingent on the ultimate outcome of the case, the witness' own interest will become intensified, and the reliability of the testimony and impartiality of the expert's position will be significantly weakened." *Id.; see also Buckley Powder Co. v. State*, 70 P.3d 547, 559 (Colo.App.2002) ("An expert witness should not receive a contingent fee because the expert may thereby be improperly motivated to enhance his or her compensation and thus lose objectivity.").

¶ 13 Similar concerns over the contingent compensation of fact witnesses have been recognized in other jurisdictions.[4] However,

---

1. Plaintiff has not cross-appealed this ruling.

2. ABA Model Rules of Professional Conduct, Rule 3.4 (1983) (a lawyer shall not "offer an inducement to a witness that is prohibited by law"); *Id.*, Comment [3] ("it is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an expert witness a contingent fee."); 'Restatement (Third) of the Law Governing Lawyers § 117, cmt. d (2002) ("A witness may not be bribed or offered compensation that is contingent on the witness's testimony or the result in the litigation.").

3. This case ultimately turned on section 12–61–712 (1), C.R.S. 2012, which prohibits appraisers from receiving contingent compensation.

4. *See, e.g., Commonwealth v. Miranda*, 458 Mass. 100, 934 N.E.2d 222, 229 n.15 (2010) ("Compensation to fact witnesses is said to violate the integrity of the judicial system, to undermine the proper administration of justice, and to be contrary to a witness's solemn and fundamental duty to tell the truth."); *Caldwell v. Cablevision Sys. Corp.*, 20 N.Y.3d 365, 960 N.Y.S.2d 711, 984 N.E.2d 909, 912 (2013) ("What is not permitted and, in fact, is against public policy, is any agreement to pay a fact witness in exchange for

these concerns are not implicated when a fact witness receives only reasonable compensation for actual expenses incurred or the reasonable value of the witness's time expended in testifying and, in some cases, preparing to testify.[5]

¶ 14 Here, plaintiff asserts that Sumner was not a contingent fee witness because its agreement with Sumner did not require him to testify. Although Sumner testified voluntarily, his contingent compensation under that agreement bore no relationship to his expenses or time expended in testifying. Therefore, we disapprove of giving Sumner a contingent interest in the outcome of the case and then calling him as a fact witness. Yet, this conclusion does not resolve whether such a fact witness must be stricken, as defendant urges.

### 1. Per Se Exclusion

■ ¶ 15 With few exceptions, "[a]ll relevant evidence is admissible," CRE 402, and "[e]very person is competent to be a witness," CRE 601.[6] Notwithstanding these rules, defendant asserts that a fact witness who can provide relevant testimony but is entitled to contingent compensation should per se be precluded from testifying. We reject this assertion based on the following four reasons.

¶ 16 First, although the "common law at one time disqualified from testifying all parties and others with any pecuniary or proprietary interest in the outcome of a suit," the "assumption that interested witnesses necessarily lie or that disqualification is the best way to deal with the threat of perjury" has been rejected. 27 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure* § 6005, at 69 (2007); *see generally Osborn v. People,* 83 Colo. 4, 26, 262 P. 892, 901 (1927).

■ ¶ 17 Second, under CRE 601, per se exclusion of testimony is disfavored. *See People v. Romero,* 745 P.2d 1003, 1016 (Colo. 1987) ("per se rule of admissibility or inadmissibility [based on hypnosis of witness] ... is inconsistent with the general trend of witness competency that every person is competent to be a witness"); *People v. McKeehan,* 732 P.2d 1238, 1240 (Colo.App. 1986) ("While evidence of relaxation techniques may be used to impeach a witness' credibility ... it does not render the witness per se incompetent to testify."); *see also United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir. 1987) (rejecting a per se rule that "an informant who is promised a contingent fee by the government is [ ] disqualified from testifying," citing similar Fed.R.Evid. 601).

¶ 18 Third, the potentially corrupting effect of contingent compensation implicates credibility, but does not involve competency,

favorable testimony, where such payment is contingent upon the success of a party to the litigation."); *In re Schapiro,* 144 A.D. 1, 128 N.Y.S. 852, 858 (1911) ("A witness who ... receives compensation or a promise of compensation for giving his testimony is necessarily a discredited witness."); *see also Reffett v. C.I.R.,* 39 T.C. 869, 878 (1963) ("[I]t seems to be a rather generally accepted rule that all agreements to pay witnesses extra compensation contingent on the success of the lawsuit are against public policy whether the agreement is with an ordinary witness, an expert witness, or a witness who cannot be compelled to testify, because such agreements constitute a direct temptation to commit perjury.").

5. *See, e.g., State of N.Y. v. Solvent Chem. Co.,* 166 F.R.D. 284, 289 (W.D.N.Y. 1996) ("To procure the testimony of witnesses it is often necessary to pay the actual expenses of a witness in attending court and a reasonable compensation for the time lost."); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 865

F.Supp. 1516, 1526 n. 11 (S.D.Fla. 1994) ("Payments made to fact witnesses as actual expenses as permitted by law will not be disturbed or set aside."); *Caldwell,* 86 A.D.3d at 52, 925 N.Y.S.2d 103 ("Where a fact witness is compensated for losses, he or she does not stand to gain anything by giving testimony but, rather, is kept in the same position as if he or she had not been required to take the time to testify."); *cf.* Colo. Bar Ass'n, Formal Ethics Opinion 103 (1998) ("[C]ompensating a witness for a reasonable amount of time spent preparing to testify ... is not prohibited by Colo. RPC 3.4, so long as it is made clear to the witness that the compensation is not for the substance or efficacy of the witness's testimony, but solely to compensate the witness for the time he or she expended in order to give testimony.").

6. Section 13–90–106, C.R.S. 2012, provides that "[p]ersons who are of unsound mind at the time of their production for examination" shall not be witnesses. This section does not refer to compensation.

such as arose from hypnosis of the witnesses in *Romero* and *McKeehan*. *Compare Erdmann v. Erdmann*, 127 Mont. 252, 261 P.2d 367, 369 (1953) ("A credible witness is one whose statements are within reason and believable and the evidence of one witness is sufficient to establish a fact."), *with Bellmore v. State*, 602 N.E.2d 111, 117 (Ind.1992) ("A competent witness is one who has 'sufficient mental capacity to perceive, to remember and to narrate .the incident he has observed and to understand and appreciate the nature and obligation of an oath.' "). Many courts that have addressed this effect hold that contingent compensation of both fact[7] and expert[8] witnesses involves credibility and weight, not per se exclusion.

¶ 19 Fourth, "questions relating to the credibility of a witness and the weight to be accorded the testimony of a witness are matters to be resolved solely by the jury." *Burlington N. R.R. Co. v. Hood*, 802 P.2d 458, 468 n.3 (Colo.1990).[9] Several courts have taken this approach to a compensated fact witness.[10] Thus, a rule of per se exclusion based on contingent compensation would be at odds with general recognition that "[i]n most instances, any potential for prejudice to a defendant's case will be avoided by allowing the witness to testify subject to searching cross-examination intended to develop fully any evidence of bias or motive on the part of the witness." *State v. McGonigle*, 401 N.W.2d 39, 42 (Iowa 1987); 2 John H. Wigmore, *Wigmore on Evidence* § 577 (3d ed. 1940); *see, e.g., People v. Ibarra*, 849 P.2d 33, 39 (Colo.1993) ("Cross-examination should be liberally permitted to allow a thorough inquiry into the motives of witnesses.").[11]

¶ 20 Some trial courts have precluded improperly paid fact witnesses because their

---

**7.** *See, e.g.,Crowe v. Bolduc*, 334 F.3d 124, 132 (1st Cir. 2003) ("the fact that the witness had financial incentives ... is, of course, classic evidence of bias"); *Jamaica Time Petroleum v. Fed. Ins. Co.*, 366 F.2d 156, 158 (10th Cir. 1966) ("The payment of the reward affects the credibility of the witness and the weight to be given his testimony. These factors are not determinative of competence to testify."); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1370 (S.D.N.Y. 1982) ("[I]t is permissible, indeed desirable, to bring any such payments to the attention of the jury and for counsel to comment upon the possible effect of large payments upon a witness' credibility."); 27 *Federal Practice & Procedure* § 6005 at n. 86 (contingent payments to a witness "present an issue of credibility to be resolved by the trier-of-fact, but do not affect competency"); *cf. United States v. Cresta*, 825 F.2d 538, 546 (1st Cir. 1987) ("Rather than adopting an exclusionary rule, courts have chosen to leave the matter to the jury to consider in weighing the credibility of the informant.").

**8.** *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir.1988) ("[the] rule against employing expert witnesses on a contingent-fee basis ... does not [mean] that evidence obtained in violation of the rule is inadmissible. The trier of fact should be able to discount for so obvious a conflict of interest."); *Mirowski Family Ventures, LLC v. Boston Scientific Corp.*, 2013 WL 441540 (S.D. Ind. No. 1: 11-cv-736-WTL-DKL, Feb. 5, 2013) ("The rule against employing expert witnesses on a contingent fee basis is a rule of professional conduct rather than of admissibility of evidence."); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 69 (Bankr.N.D.Ill.2002) (holding that the Federal Rules of Evidence do not bar testimony from contingent fee experts); *Wirth v.*

*State Bd. of Tax Commis.*, 613 N.E.2d 874, 877 (Ind.Tax 1993) ("testimony of contingently paid experts is not subject to exclusion ... solely on the basis of the expert's contingent fee").

**9.** A narrow exception to the factfinder's prerogative arises where testimony is incredible as a matter of law. *See, e.g., People v. Dash*, 104 P.3d 286, 289 (Colo.App.2004). "However, testimony that is merely biased ... is not incredible as a matter of law." *Id.*

**10.** *See United States v. Valona*, 834 F.2d 1334, 1343 (7th Cir.1987) ("jury to consider the fee arrangement in its evaluation of witness credibility"); *Cervantes–Pacheco*, 826 F.2d at 315 ("it is up to the jury to evaluate the credibility of the compensated witness"); *United States v. Hodge*, 594 F.2d 1163, 1165–67 (7th Cir.1979) ("[t]he method of payment is properly a matter for the jury to consider in weighing the credibility of the informant"); *Jamaica Time Petroleum*, 366 F.2d at 158 (credibility of witness paid a reward is for the jury to determine).

**11.** *See also Crowe*, 334 F.3d at 132 ("Where witnesses under contingent fee agreements are permitted to testify, examination on the contingent fee is considered vital."); *Wheeler v. United States*, 351 F.2d 946, 947 (1st Cir.1965) ("inquiry into the possible financial stake of a witness in a particular outcome of a case in which the witness is testifying is a proper subject for cross-examination"); *but see McGonigle*, 401 N.W.2d at 42 (trial court can exclude contingent fee witnesses when "no reasonable person could conclude other than that the testimony was inherently untrustworthy and was elicited as part of a corrupt or coercively induced bargain").

payment violates ethical rules. *See, e.g.,Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 865 F.Supp. 1516, 1526 (S.D.Fla.1994) (excluding fact witness as a sanction where lawyer "violated the very heart of the integrity of the justice system"). We read such cases as exercising trial court discretion, not imposing a per se disqualification rule. Other cases that contain similar strong language against paying witnesses on a contingent basis often involve either the enforceability of agreements to pay witnesses a contingent fee or whether an attorney can be disciplined for providing such a payment. *See, e.g., The Florida Bar v. Jackson,* 490 So.2d 935 (Fla. 1986) (disciplinary proceeding); *see also Accrued Fin. Servs., Inc. v. Prime Retail, Inc.,* 2000 WL 976800 (D.Md. No. CIV.JFM–99–2573, June 19, 2000) (unpublished order) (assignment void), *aff'd,* 298 F.3d 291 (4th Cir. 2002).

¶ 21 Because these cases do not analyze whether contingent fee witnesses are competent under rules analogous to CRE 601 or whether their contingent payment should be treated as a matter affecting credibility, they do not persuade us to adopt a per se rule precluding otherwise relevant testimony from contingent fee witnesses. Rather, the better approach leaves the admissibility of

their testimony a matter of trial court discretion. Trial courts are in a unique position to assess the impact of such testimony on the overall integrity of the proceedings and to take measures to preserve the fairness of the trial.[12]

### 2. Preclusion as a Sanction

¶ 22 The trial court could have precluded Sumner's testimony as a sanction, if it found either bad faith by plaintiff[13] or conduct by plaintiff's counsel inconsistent with Colo. RPC 3.4(b).[14] We express no opinion on bad faith, which the trial court shall consider on remand. *See Byrne v. Nezhat,* 261 F.3d 1075, 1123 (11th Cir. 2001) ("Unless the evidence on the issue of bad faith is uncontroverted, a district court should examine a party's conduct and make findings on that issue.").

¶ 23 As to Colo. RPC 3.4(b), however, the trial court has already found that "Mr. Sumner got into the case ... in exchange for 10 percent of any recovery," and that he was "providing expert testimony in exchange for a contingency fee [which] is not permitted." Because the record supports these findings, we discern no reason to require that the trial court make further findings concerning Colo. RPC 3.4(b).[15] Instead, we conclude that call-

---

12. For example, the court might instruct the jury that in weighing credibility, it could consider that the witness was being compensated on a contingent basis. *Cf. Trattler v. Citron,* 182 P.3d 674, 683 (Colo.2008) ("instructing the jury that noncompliance [with disclosure] may reflect on the credibility of the witness"). Or the court could afford the adverse party broader cross-examination into the contingent fee agreement. *See Cresta,* 825 F.2d at 545 ("the defense counsel must be permitted to cross-examine the witness about the agreement").

13. *See Goldin v. Bartholow,* 166 F.3d 710, 722 (5th Cir.1999) ("The imposition of sanctions using inherent powers must be accompanied by a specific finding of bad faith."); *Sussman v. Bank of Israel,* 56 F.3d 450, 459 (2d Cir.1995) ("A court has the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad faith conduct."); *Pressey v. Patterson,* 898 F.2d 1018, 1021 (5th Cir.1990) ("bad faith is judged by necessarily stringent standards"); *cf. Lauren Corp. v. Century Geophysical Corp.,* 953 P.2d 200, 203 (Colo.App. 1998) ("trial court has the inherent power to impose ... sanctions" for spoliation of evidence).

14. *Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.,* 347 F.3d 693, 698–99 (8th Cir.2003) (exclusion of evidence as a sanction for counsel's violation of the Rules of Professional Conduct during pretrial investigation within the trial court's discretion); *see also Golden Door Jewelry,* 865 F.Supp. at 1525 ("The Court finds that the exclusion of all evidence tainted by the ethical violations is proper and appropriate.... That it was [the client who] provided the actual funds for the payments rather than its counsel does not defeat the application of [Rule 3.4(b)]. The evidence in the record shows quite clearly that ... counsel [ ] actively had knowledge of, assisted and even negotiated the amounts of the money paid to non-expert witnesses.").

15. The court made no finding when plaintiff's counsel learned of Sumner's contingent compensation. But even if counsel disclosed Sumner as a witness before knowing of his direct financial interest in the outcome, counsel could have withdrawn the designation upon learning of that interest. Instead, counsel opposed Murray's motion to strike Sumner based on his contingent interest.

ing Sumner as a witness was contrary to Colo. RPC 3.4(b).[16] However, this conclusion does not resolve whether Sumner's testimony should now be stricken.

¶ 24 "[W]here the Rules of Professional Conduct become intertwined with litigation and a potential ethical violation threatens to prejudice the fairness of the proceedings, a trial court may consider the issue not as a disciplinary matter but rather within the context of the litigation." *Mercantile Adjustment Bureau, L.L.C. v. Flood*, 278 P.3d 348, 354 (Colo.2012). Such rulings most often arise in attorney disqualification. *See, e.g., Liebnow v. Boston Enterps. Inc.*, 2013 CO 8, ¶ 11, 296 P.3d 108. They involve discretion derived from the trial court's "inherent power to ensure the integrity of the process and fairness to the parties." *In re Estate of Myers*, 130 P.3d 1023, 1025 (Colo. 2006).

¶ 25 Here, after finding that Sumner had a ten percent contingent interest in the outcome of the case, the trial court explained:

> I don't see anything nor is the Court aware of any prohibition on someone putting a little sweat equity into a case. I mean, lawyers do it all the time. That's what a contingency fee case is but that's not someone rendering an expert opinion. That's someone coming in and assisting in that regard and buying in with their contractual agreement to perform certain services, so unless someone can come up with some case law to the contrary or some statutory authority to the contrary, that's what we're going to do.

16. In so concluding, we do not address any aspect of attorney regulation. *See Mercantile Adjustment Bureau, L.L.C. v. Flood*, 278 P.3d 348, 354 (Colo. 2012) (noting the supreme court's "exclusive power to regulate the practice of law"). Further, our conclusion need not be supported by clear and convincing evidence, which C.R.C.P. 251.18(d) requires in matters of attorney discipline. *See People v. Fitzgibbons*, 909 P.2d 1098, 1104 (Colo.1996) (due to differing burdens of proof, a determination of frivolousness under C.A.R. 38(d) is not collateral in a later disciplinary proceeding).

17. Because the trial has already occurred, prospective actions that could have protected the integrity and fairness of the process are no longer available.

This description of the law is inaccurate, and the court's analogy to contingency fees cases is flawed because trial counsel are usually precluded from testifying. *See* Colo. RPC 3.7. Thus, whether the court even considered excluding Sumner's testimony as a sanction based on Colo. RPC 3.4(b), which Murray cited below, is doubtful. And in any event, the court did not have the benefit of our analysis.

¶ 26 Accordingly, we conclude that remand is necessary for the trial court to make findings, which should address Sumner's contingent compensation, direct testimony, and cross-examination, in the context of the "need to protect the integrity of the trial." *Liebnow*, ¶ 13.[17] The court may take additional evidence. After making findings, the court shall exercise its discretion and determine whether Sumner's testimony should be stricken as a sanction for either plaintiff's bad faith, if any, or based on Colo. RPC 3.4(b).[18] *See id.*, ¶ 14 ("[I]t is within the exclusive province of the trial court to determine whether a violation of the rules regarding conflict harms the fairness of the proceedings.").

¶ 27 If the trial court strikes Sumner's testimony, the court shall set the matter for a new trial, because his testimony accounted for a significant portion of plaintiff's case.[19] But if the court declines to strike the testimony, a new trial is not required based on Sumner's testimony because we discern no other ground on which this testimony should have been excluded, as explained in the remainder of this section.

18. We do not address whether any other sanction would be appropriate in these circumstances because the only sanction sought by defendant on appeal was striking the testimony.

19. Plaintiff called only two witnesses, Mahoney and Sumner. Sumner testified over the course of two days. In closing argument, plaintiff's counsel told the jury that the summary exhibits introduced through Sumner (discussed in subsection D below) were "the most important document[s] that you've got ... because, my goodness, I mean, there are a lot of documents for you to try and absorb."

**C. The Trial Court Did Not Abuse Its Discretion in Allowing Sumner to Testify as a Summary Witness**

¶ 28 Defendant's in limine motion also sought to exclude Sumner's testimony based on the "personal knowledge" requirement of CRE 602 because:

Mr. Sumner has . . . said he has no personal knowledge of any incident that occurred. . . . I don't know exactly what he's going to testify to. I think he prepared some summaries . . . but I don't think you can go out and take a lay witness and have him look at documents and come in and testify.

In denying the motion, the trial court explained that complex trials often involve summary witnesses, but cautioned that Sumner's testimony could be based only on admissible evidence.

¶ 29 A trial court's decision on such an evidentiary issue is reviewed for an abuse of discretion. *People v. Valencia,* 257 P.3d 1203, 1209 (Colo.App.2011). A trial court does not abuse its discretion unless its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 30 On appeal, defendant again argues that contrary to CRE 602, Sumner "had no personal knowledge of any of the events . . . involved in this controversy." Rather, he "was allowed to testify as to his review of the evidence" and summarize what the evidence showed. Colorado courts have not addressed the admissibility of summary witness testimony under CRE 602.

¶ 31 Other courts to have done so generally hold such testimony admissible. *See* 27 *Federal Practice & Procedure* § 6026, at 229 (courts "favor [ ] permitting the summary witness to testify for reasons analogous to those underlying Rule 1006, which permits the introduction of summaries of writings and other real evidence"); *see also In re Furr's Supermarkets, Inc.,* 373 B.R. 691, 704 (B.A.P. 10th Cir.2007) ("A 'summary witness' is ordinarily allowed to testify."). In *Cowles*

*v. Sheeline,* 259 Mont. 1, 855 P.2d 93, 101 (1993), for example, the court explained:

[J]ust as an expert can assist a jury by imparting special knowledge that helps the jury to understand technical evidence, a non-expert summary witness can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial.

(quoting *United States v. Lemire,* 720 F.2d 1327, 1347 (D.C.Cir.1983)); *see also In re Furr's Supermarkets, Inc.,* 373 B.R. at 703 ("it does not take an expert to create graphs and summarize data").

¶ 32 Further, and contrary to defendant's lack of personal knowledge argument, a summary witness has such knowledge based on an independent review of other evidence. *See In re Furr's Supermarkets, Inc.,* 373 B.R. at 704 ("no violation of either Rule 602's literal language or its overriding purpose" where witness "only summarized evidence . . . that several prior witnesses had already offered; he did not testify about any of the events underlying the trial; [and] he testified from his personal knowledge of the exhibits and transcripts"); *accord Bryant v. Farmers Ins. Exch.,* 432 F.3d 1114, 1123 (10th Cir. 2005) (summary witness did not violate Fed. R.Evid. 602 "[s]ince she personally examined these audit reports, she had personal knowledge of their content").[20] The rationale of these authorities is persuasive and conforms to the broad discretion afforded trial courts in evidentiary matters.

¶ 33 Defendant relies on criminal cases that allow summary witnesses in "limited circumstances in complex cases," but caution against using such witnesses "as a substitute for, or a supplement to, closing argument." *See United States v. Armstrong,* 619 F.3d 380, 385 (5th Cir.2010); *accord United States v. Nguyen,* 504 F.3d 561, 572 (5th Cir.2007) (although court "may admit summary witness testimony in limited circumstances . . .

---

**20.** As explained in *Federal Practice & Procedure* § 6026, at 229:

A personal knowledge problem related to the summary witness is presented where a witness testifies after viewing a photo or video but did not directly perceive the events depicted. The witness may testify so long as the witness limits her testimony to what she saw in the photo or video and does not purport to testify as to the live events.

the purpose of summary evidence is not simply to allow the Government to repeat its entire case-in-chief shortly before jury deliberations"). Yet, these cases also recognize that such dangers are reduced by requiring that the summary testimony has "an adequate foundation in evidence that is already admitted." *Armstrong*, 619 F.3d at 385; *see Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2d Cir.1990) (summary witness testimony "must be based upon and fairly represent competent evidence already before the jury") (quoting *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir.1977)).[21]

¶ 34 Here, the trial court ruled that Sumner would only be allowed to "provid[e] the jury with a summary analysis of the documents or the information contained in documents that will have been admitted into evidence." Defendant does not dispute that all documents to which Sumner referred had been admitted, most by stipulation. The court also found that the case was complicated—both parties submitted over 100 exhibits each in an eight-day jury trial—and that a summary witness could help the jury determine "how the pieces fit together from the documents." Because the record supports these findings, we cannot say that this ruling was manifestly arbitrary, unreasonable, or unfair. *People v. Osario–Bahena*, 2013 COA 55, ¶ 65, 312 P.3d 247, 258–59 ("Because the record supports this decision, we discern no abuse of discretion.").

### D. The Contention That Sumner's Testimony Violated CRE 701 Will Not Be Addressed Because It Is Unpreserved

¶ 35 Following the trial court's ruling that Sumner could not testify as an expert, defendant did not challenge any of Sumner's contemplated testimony as improper opinion by a lay witness under CRE 701. Defendant received a standing objection to Sumner's testimony under CRE 602. This objection was not based on CRE 701.

Therefore, CRE 701 is not properly before us. *See Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 n. 10 (Colo. 2004) ("Arguments not raised before the trial court may not be raised for the first time on appeal.").

¶ 36 In sum, we direct the trial court on remand to address preclusion of Sumner's testimony as a sanction, but otherwise discern no ground for reversal in allowing Sumner to testify.

### III. The Trial Court Did Not Abuse Its Discretion by Admitting Sumner's Summary Exhibits

¶ 37 Over defendant's objection, the trial court admitted two exhibits prepared by Sumner—an eight-page, black and white summary of the documentary evidence, with some wording in bold face type, and a one-page, color timeline. Defendant argues, as he did below, that these exhibits were inadmissible under CRE 1006 because they were based on evidence already admitted during the trial and were unduly prejudicial. A trial court's evidentiary ruling under CRE 1006 is reviewed for an abuse of discretion. *U.S. Welding, Inc. v. B & C Steel, Inc.*, 261 P.3d 513, 517 (Colo.App. 2011).

¶ 38 CRE 1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The proponent of summary evidence must establish, among other things, that the documents underlying the summary are voluminous. *U.S. Welding, Inc.*, 261 P.3d at 517 (citing *People v. McDonald*, 15 P.3d 788, 790 (Colo.App. 2000)).

¶ 39 Defendant argues that the underlying documents could not have been "too voluminous for convenient in-court examination," because all of them had been admitted into evidence.[22] Defendant cites no support-

---

**21.** Defendant argues on appeal that the jury should have been given a limiting instruction on the purpose of Sumner's testimony. However, because he did not request such an instruction below, this issue is not preserved. *See Robinson v. City & Cnty. of Denver*, 30 P.3d 677, 684 (Colo.App.2000) ("Ordinarily, objections made to

instructions for the first time on appeal in civil cases will receive no consideration by an appellate court.").

**22.** Defendant also argues that the trial court should have instructed the jury on the limited purpose of these exhibits. Again, however, be-

ing Colorado authority for this proposition, nor have we found any.

¶ 40 Because Fed.R.Evid. 1006 is substantially similar to CRE 1006, cases interpreting it are instructive. *Leiting v. Mutha*, 58 P.3d 1049, 1052 (Colo.App. 2002). Most federal courts that have addressed defendant's argument reject it. For example, in *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979), the court explained:

> There is no requirement in Rule 1006, however, that it be literally impossible to examine the underlying records before a summary or chart may be utilized. All that is required for the rule to apply is that the underlying "writings" be "voluminous" and that in-court examination not be convenient.[23]

Other federal courts have noted that such an interpretation is "clearly inconsistent with one proper method of laying a foundation for admission of summary charts—admitting the documentation on which the summary is based." *United States v. Stephens*, 779 F.2d 232, 239 (5th Cir.1985) (citing 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 1006[03], at 1006–7 (1983)). The rationale of those cases is persuasive.

¶ 41 Here, the trial court found that the underlying documents were voluminous and that because the case was "complicated enough," plaintiff needed "some method to demonstrate to the jury how it all comes together ... otherwise the jury is never going to understand this." As noted above, over 200 exhibits were admitted during the eight-day trial. *See, e.g., Stephens*, 779 F.2d at 239 (where evidence "involved hundreds of exhibits ... [e]xamination of the underlying materials would have been inconvenient without the [summary] charts"); *Scales*, 594 F.2d at 562 ("With 161 exhibits ... comprehension

of the exhibits would have been difficult, and certainly would have been inconvenient, without the [summary] charts.").

¶ 42 Alternatively, defendant argues that the summary exhibits were unduly prejudicial. *See United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998) (Fed.R.Evid. 1006 requires that a summary document "must be accurate and nonprejudicial"). He correctly points out that the exhibits contained characterizations such as "what the plaintiff knew" and "what the plaintiff didn't know," and they "emphasized some documents through bolding ... and through the use of varying colors." However, this argument fails for two reasons.

● First, the underlying documents were admitted as evidence. *See Bray*, 139 F.3d at 1112 (when "summaries [are] admitted in lieu of the underlying documents," information should not be "embellished by or annotated with the conclusions of or inferences drawn by the proponent, whether in the form of labels, captions, highlighting techniques, or otherwise"). And where those documents have been admitted, Rule 1006 does not "require the fact finder to accept the information present on the summary charts as true." *United States v. Massey*, 89 F.3d 1433, 1441 n.9 (11th Cir. 1996).

● Second, "[a] party is not obligated ... to include within its charts or summaries its opponent's version of the facts." *United States v. Swanquist*, 161 F.3d 1064, 1073 (7th Cir.1998); *see United States v. Bishop*, 264 F.3d 535, 547 (5th Cir.2001) ("A summary may include only evidence favoring one party, so long as the witness does not represent to the

---

cause he failed to request such an instruction, this issue is unpreserved. *See Robinson*, 30 P.3d at 684.

23. *See also United States v. Winn*, 948 F.2d 145, 157–58 (5th Cir.1991) ("[C]onsidering that the average jury cannot be rationally expected to compile on its own such charts and summaries which would piece together evidence previously admitted and revealing a pattern suggestive of criminal conduct, summary/testimony charts may be admitted."); *United States v. Possick*, 849

F.2d 332, 339 (8th Cir.1988) ("Rule 1006 does not require that it be literally impossible to examine all the underlying records, but only that in-court examination would be an inconvenience."); *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir.1985) ("The language of Rule 1006 is not so restrictive ... [t]he fact that the underlying documents are already in evidence does not mean that they can be 'conveniently examined in court.'").

jury that he is summarizing all the evidence in the case.").

¶ 43 Accordingly, the trial court did not abuse its discretion in admitting Sumner's summary exhibits.

### IV. The Trial Court Properly Denied Defendant's Directed Verdict Motion

#### A. Sufficiency of the Evidence

¶ 44 At the close of plaintiff's case, defendant moved for a directed verdict, arguing that the evidence was insufficient to establish fraud. The trial court denied the motion.

¶ 45 Directed verdicts are disfavored. *Langlois v. Bd. of Cnty. Comm'rs,* 78 P.3d 1154, 1157 (Colo.App.2003). A court may direct a verdict only if the evidence "compels the conclusion that reasonable people could not disagree and that no evidence, or legitimate inference from the evidence, has been presented upon which a jury verdict against the moving party could be sustained." *Id.* Denial of a directed verdict motion is reviewed de novo. *Park Rise Homeowners Ass'n v. Res. Constr. Co.,* 155 P.3d 427, 431 (Colo.App.2006).

¶ 46 The elements of fraudulent misrepresentation are:

(1) a ... misrepresentation of material fact was made by the defendant; (2) at the time the representation was made, the defendant knew the representation was false or was aware that he did not know whether the representation was true or false; (3) the plaintiff relied on the misrepresentation; (4) the plaintiff had the right to rely on, or was justified in relying on, the misrepresentation; and (5) the reliance resulted in damages.

*Barfield v. Hall Realty, Inc.,* 232 P.3d 286, 290 (Colo.App.2010).

¶ 47 The elements of fraudulent concealment are:

(1) concealment of a material fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the

one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*Nielson v. Scott,* 53 P.3d 777, 779 (Colo.App. 2002).

¶ 48 Defendant first argues that the evidence does not show he knowingly misrepresented the potential commission plaintiff would have been entitled to if Pearl were sold to Epic—which plaintiff asserts was over $ 1,000,000—because he mistakenly relied on an analysis done by another employee of Pearl valuing that commission at $ 700,000. During one of defendant's phone calls with Mahoney, he said:

And I think as far as the sensitivity around Epic, I think that would even be worse..... [A]t this point in time, I'm not sure where we're going on that anyway, because they're—if we paid you 250 there, *based on their last offer, you're probably only going to be due another $ 400,000 anyway.*

(Emphasis added.)

¶ 49 Plaintiff presented evidence that the $ 650,000 estimate reflected only the cash component of the Epic offer, rather than the total purchase price of $ 31,500,000. But under the Harvest Agreements, of which defendant was aware as president, plaintiff's commission was based on the total price. Hence, the jury could have concluded that defendant knew the commission to which plaintiff would be entitled but knowingly misrepresented it.

¶ 50 Defendant next argues that the evidence does not show he fraudulently concealed any material facts about the possible sale to Epic because he told Mahoney that Pearl was unwilling to include any representation about the status of negotiations with Epic in the Termination Agreement. The following exchange occurred during the same phone call:

Mahoney: [W]ould you be willing to include in the agreement a representation that you don't have a signed letter of intent with Epic?

Defendant: Well, I may. I guess we'd have to talk to [Pearl's Board] and decide

how we want to do that. You know, that's been taking it to a level with these other agreements that *we're not sure where we are*. I mean—so let me see if that's something that we'd be willing to put in that agreement. *I'm not overly worried about that,* but I think, you know, that—but, I mean, if that's the condition, we'd have to see how we'd want to handle that. That's your concern, is that we have a signed letter of intent that we're trying to squeeze you out of the deal, huh?

(Emphasis added.)

¶ 51 Defendant also told Mahoney that the Epic sale "may go nowhere"; they were "evaluating the tax ramifications" of the sale; it was "a pretty high hill to climb"; and the board of directors was "pretty well done with" moving forward on the sale of Pearl. Defendant suggested, "[i]f nothing happens, you get nothing ... I don't know what it's worth for you to just walk away and take a roll of the dice...." And he explained the only reason Pearl wanted to terminate the Harvest Agreements was because "now I have this deal hanging out there that I could potentially have to put [the potential commission liability] in financial statements as a contingent deal...."

¶ 52 Before this conversation, Pearl and Epic had signed a letter of intent. Thus, the jury could have concluded that defendant fraudulently concealed facts material to the Epic sale.

### B. Economic Loss Rule

¶ 53 Defendant also argues that a directed verdict should have been entered because the economic loss rule bars plaintiff's fraud claim. Defendant raised the economic loss rule in his motion for summary judgment, which was denied. However, in supplemental briefing, defendant concedes that he did not raise it when moving for a directed verdict, at any other time during the trial, or in a post-trial motion.

¶ 54 The denial of a summary judgment on a particular issue is not appealable after a trial on the merits, unless the moving party preserved the issue by moving for a directed verdict or a JNOV. *Feiger, Collison & Killmer v. Jones*, 926 P.2d 1244, 1251 (Colo.1996); *see also W. Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 577 (Colo.App.2006) ("Because E–One only raised the economic loss rule issue in its motion for judgment on the pleadings and not in any subsequent motion, we conclude that E–One abandoned the issue, and therefore, it may not be reviewed on appeal.").

¶ 55 Nevertheless, defendant argues that because plaintiff "failed to object to the lack of specificity" in his directed verdict motion, it waived failure to specifically raise the economic loss rule. Defendant cites no Colorado authority, nor have we found any, applying waiver in this manner. To the contrary, "waiver occurs when a defendant specifically removes claims from the trial court's consideration." *People v. Bryant*, 2013 COA 28, ¶ 13 n. 2, 316 P.3d 18, 22 (citing *People v. Rodriguez*, 209 P.3d 1151, 1160 (Colo.App. 2008), *aff'd*, 238 P.3d 1283 (Colo.2010)).

¶ 56 Alternatively, defendant asserts that we should address the economic loss rule under C.A.R. 1(d), which affords an appellate court discretion to notice unpreserved errors appearing of record. *See, e.g., Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1009 (Colo. 2008). We decline to do so for the following reasons:

● The economic loss rule exists only "to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining," by "maintain[ing] the boundary between contract law and tort law." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259 (Colo.2000).

● Thus, taking up this unpreserved issue is not "necessary to avert unequivocal and manifest injustice." *Harris Grp. Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo.App.2009).

● Nor does the economic loss rule implicate a constitutional right. *See Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1269 (Colo.App.2010).

And unlike in *Robinson*, the law concerning the economic loss rule was not in flux when this case was tried.

¶ 57 Accordingly, the trial court did not err in denying the directed verdict motion.

### V. The Trial Court Did Not Err in Declining to Instruct the Jury on Pearl As a Nonparty at Fault

¶ 58 Defendant requested a jury instruction on apportioning fault to Pearl as a nonparty for the conduct of its employees other than himself and Rhinesmith. He conceded that without this limitation, such an instruction might lead to duplicative apportionment, because Rhinesmith had already been designated as a nonparty at fault under section 13–21–111.5, C.R.S. 2012. However, defendant explained:

> [B]ut what I'm talking about is Pearl should be on the verdict form because people, employees and agents other than Mr. Rhinesmith and other than [defendant] were involved in the conduct that [plaintiff] claims was fraudulent.
>
> . . .
>
> I think the Court can instruct the jury that they could attribute fault to Pearl Development for conduct by persons other than— conduct by employees or agents other than Mr. Rhinesmith and Mr. Murray, then I think you solve the problem.

Plaintiff responded that because defendant had failed to designate these other employees whose conduct allegedly made Pearl liable, defendant could not rely on vicarious liability to establish Pearl's nonparty fault.

¶ 59 Alternatively, defendant argued that he could designate Pearl under section 13–21–111.5(3)(b) because plaintiff had settled with Pearl. *See Smith v. Zufelt*, 880 P.2d 1178, 1183 (Colo.1994) (nonparty settlements offset a defendant's liability by the percentage of liability attributed to the nonparties under section 13–21–111.5). Plaintiff denied having settled with Pearl.

¶ 60 The trial court rejected the instruction, explaining that it could not "attribute fault under [section 13–21–111.5] vicariously because vicarious liability is not someone committing an act that gives rise to the liability. It's attributing somebody else's conduct to them." The court did not address the settlement argument.

¶ 61 The propriety of a defendant's nonparty designation under section 13–21–111.5 presents a question of law subject to de novo review. *See Pedge v. RM Holdings, Inc.*, 75 P.3d 1126, 1128 (Colo.App.2002).

¶ 62 Section 13–21–111.5 provides in relevant part:

> (3)(a) Any provision of the law to the contrary notwithstanding, the finder of fact in a civil action may consider the degree or percentage of negligence or fault of a person not a party to the action, based upon evidence thereof, which shall be admissible, in determining the degree or percentage of negligence or fault of those persons who are parties to such action. . . .
>
> (b) Negligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty *or* if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action. . . .

(Emphasis added.)

¶ 63 This section applies to "any conduct other than breach of contract that constitutes a civil wrong and causes injury or damages." *Core–Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 47, 300 P.3d 963. It covers civil wrongs "even when one of the tortfeasors commits an intentional tort." *Toothman v. Freeborn & Peters*, 80 P.3d 804, 816 (Colo.App.2002).

¶ 64 Here, plaintiff's fraud claim against Pearl was based on only its vicarious liability. *See Raleigh v. Performance Plumbing & Heating, Inc.*, 130 P.3d 1011, 1019 (Colo. 2006) (an employer is vicariously liable for the acts of its employee committed in the course of the employee's employment). No Colorado case has addressed a nonparty at fault designation where the party's fault is only vicarious. For the following three reasons, we conclude that a designation based on only vicarious liability is insufficient.

¶ 65 First, vicarious liability "is imputed based on the tortious acts of another." Re-

statement (Third) of Torts: Apportionment of Liability § 13 (2000). As explained in the Restatement: "The vicariously liable party has not committed any breach of .duty ·to the plaintiff but is held liable simply as a matter of legal imputation of responsibility for another's tortious acts." *Id.* at cmt. c; *see Arnold v. Colo. State Hosp.,* 910 P.2d 104, ·107 (Colo.App.1995) ("An employer's liability for an employee's negligence ... is only a secondary liability.").

¶ 66 In contrast to such secondary liability, "the person or entity designated under § 13–21–111.5 must, in order for his or her fault or negligence to be measured under the statute, owe or have owed a duty recognized by the law to ·the injured plaintiff." *Miller v. Byrne,* 916 P.2d 566, 578 (Colo.App. 1995); *see also Stone v. Satriana,* 41 P.3d 705, 712 (Colo.2002) ("[A] nonparty-at-fault designation is only proper when the defendant has made out a prima facie case that the potential nonparty breached a legal duty to the plaintiff."). Thus, we agree with the observation that "the named defendant cannot rely on the vicarious liability of a nonparty to establish the nonparty's fault." *Nash v. Wells Fargo Guard Servs., Inc.,* 678 So.2d 1262, 1264 (Fla.1996).

¶ 67 Second, requiring a defendant to designate the underlying tortfeasor who breached a duty, rather than the nonparty who may be vicariously liable but did not breach a duty, furthers the notice function of section 13–21–111.5. Such notice affords the plaintiff two options. "[I]f a defendant is limited to designating a person or entity who owes the plaintiff a duty, the plaintiff may respond to the designation by amending his or her complaint to add the designated party as a defendant." *Miller,* 916 P.2d at 577. Alternatively, "a designation may place a plaintiff in the position of defending the nonparty to ensure full recovery from named defendants." *Fed. Deposit Ins. Corp. v. Isham,* 782 F.Supp. 524, 530 (D.Colo.1992). But here, defendant's designation of Pearl, rather than any of its employees other than Rhinesmith, deprived plaintiff of these options.

¶ 68 Third; designating an employer which is only vicariously liable, in an action involving one or more employee defendants and other employees who are neither defendants nor designated nonparties for whose conduct the employer may be liable, could lead to juror confusion. And to avoid duplication in apportioning fault to the employer, the jury would have to separate out the fault of each employee, all of whom may have engaged in overlapping conduct having a similar effect on the plaintiff. *Cf. Fognani v. Young,* 115 P.3d 1268, 1272 (Colo.2005) (advocate witness rule meant to "avoid the confusion that results for a jury when the lawyer acts in the dual roles of witness and advocate").

¶ 69 Defendant's settlement argument does not suffice to disturb the trial court's ruling. Although the court did not expressly reject this argument, rejection is implicit in the ruling that it would not instruct the jury on Pearl as a nonparty at fault. *See Janicek v. Obsideo, LLC,* 271 P.3d 1133, 1138 (Colo.App. 2011) ("While the trial court did not explicitly reject homeowners' contractual interpretation argument, such a finding was implicit in the court's ruling that homeowners were not entitled to claim a homestead exemption."). The record supports this implicit ruling.

¶ 70 After plaintiff commenced this action, Pearl filed for bankruptcy. Then plaintiff moved to dismiss Pearl without prejudice because the bankruptcy court had exclusive jurisdiction over its claim against Pearl. The dismissal motion did not refer to a settlement with Pearl.

¶ 71 Seven months after Pearl had been dismissed, defendant filed his nonparty designations, which stated that plaintiff had settled with Pearl. At that time, defendant presented no support for the alleged settlement.

¶ 72 Nor did defendant offer any evidence of this purported settlement during the instruction conference, or direct the court's attention to such evidence that had been previously admitted. And on appeal, defendant cites nothing in the record showing that plaintiff settled with Pearl, which plaintiff continues to deny. *See Subsequent Injury Fund v. Gallegos,* 746 P.2d 71, 73 (Colo.App. 1987) ("[T]he statements of counsel may not substitute for that which must appear of

record."). Thus, defendant failed to satisfy his burden, as the proponent of the instruction. *See Stone*, 41 P.3d at 712.

¶ 73 Accordingly, we conclude that the trial court properly declined to instruct the jury on Pearl as a nonparty at fault.

### VI. Conclusion

¶ 74 The judgment is vacated, the denial of defendant's motion in limine to preclude Sumner from testifying is vacated in part and the case is remanded for the trial court to consider precluding Sumner as a sanction. If the court concludes that Sumner should not have testified, defendant must be granted a new trial, which shall be conducted in accordance with this opinion. If the court concludes that this sanction is not warranted, the court shall reenter its original judgment, subject to defendant's appeal of that ruling. If defendant does not so appeal, the judgment will be deemed affirmed. In all other respects, the rulings of the trial court are affirmed.

JUDGE HAWTHORNE concurs.

JUDGE RICHMAN concurs in part and dissents in part.

JUDGE RICHMAN, concurring in part and dissenting in part.

¶ 75 I concur with the majority's conclusion that the trial court erred in its ruling on defendant's motion in limine regarding the testimony of witness Sumner. I agree that Sumner was a contingent fee witness, that his role as a contingent fee witness was known to and acquiesced in by plaintiff's counsel, and that therefore offering his testimony runs afoul of Colo. RPC 3.4(b).

¶ 76 However, given the majority's conclusion that counsel's conduct was "contrary to" Colo. RPC 3.4(b), I disagree that a remand is necessary for the trial court to consider an appropriate sanction. Under the circumstances present here, the testimony should be stricken, and a new trial held. Otherwise, the majority's expression of disapproval of contingent fee witnesses has no bite.

¶ 77 I perceive that the majority favors remand for essentially two reasons. First, it

eschews a per se exclusionary rule because of evidentiary concerns under CRE 601 and because some courts have held that the corrupting effect of contingent fee witnesses involves only the witness's credibility and weight to be given to his or her testimony, which can be addressed by cross-examination for bias. Second, it relies on the principle from our case law that conflicts with ethical rules that occur in litigation should first be addressed in the trial court.

¶ 78 However, as described below, numerous courts have also found that payment of a witness, whether on a contingency or directly, presents a more serious problem than witness credibility alone and have precluded or stricken paid witnesses. And, although some ethical issues affecting the course of litigation should first be addressed in the trial court, I do not believe that the remedy for the unethical presentation of a paid witness is one of them.

¶ 79 The majority acknowledges that courts must consider ethical violations within the context of the litigation where a "potential ethical violation threatens to prejudice the fairness of the proceedings." *Liebnow v. Boston Enterps. Inc.*, 2013 CO 8, ¶ 11, 296 P.3d 108, 113. I agree with the majority that "such rulings generally involve discretion derived from the trial court's 'inherent power to ensure the integrity of the process and fairness for the parties.'" *Id.* at ¶ 12, 296 P.3d at 113. Of course, I am also mindful of the additional language in *Liebnow* that "it is within the exclusive province of the trial court to determine whether a violation of the rules regarding conflict harms the fairness of the proceedings." *Id.* at ¶ 13, 296 P.3d at 113.

¶ 80 In this case, however, the ethical issue does not arise, as it did in *Liebnow*, from a potential conflict of interest by counsel for one of the parties, where the prejudice might not have been apparent or might not have actually been present. Nor would a disciplinary proceeding, if brought, rectify the unfairness which the conduct had on the trial because the conflict with the ethical rule goes to the very heart of the evidentiary process under which this case proceeded to trial. Therefore, because I believe that presenting

a contingent fee witness necessarily goes to the integrity and fairness of the trial, I conclude that a trial verdict that results from the testimony of such a witness is, by definition, unfair and improper and must be reversed. A remand for the trial court to consider the prejudice is not necessary.

¶ 81 To perceive that contingent fee witnesses necessarily impact the fairness of the trial, we need only survey the cases, in addition to those cited by the majority in footnote 4, that discuss why paying a fee (other than expenses) to any fact witness for testifying is prohibited.

¶ 82 As the Colorado Supreme Court explained long ago, "[I]t is both illegal and against public policy to pay or tender something of value to a witness in return for his testimony." *People v. Belfor,* 197 Colo. 223, 226, 591 P.2d 585, 587 (1979).

¶ 83 In *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 865 F.Supp. 1516, 1525 (S.D.Fla.1994), the trial court barred the testimony of witnesses compensated by an insurance company, quoting from *The Florida Bar v. Jackson,* 490 So.2d 935, 936 (Fla.1986) (Ehrlich, J., concurring in part and dissenting in part):

> The very heart of the judicial system lies in the integrity of the participants.... Justice must not be bought or sold. Attorneys have a solemn responsibility to assure that not even the taint of impropriety exists as to the procurement of testimony before courts of justice.

¶ 84 Specifically addressing Florida's professional conduct rule analogous to Colo. RPC 3.4, the court held that the rule clearly prohibits

> a lawyer from paying or offering to pay money or other rewards to witnesses in return for their testimony, be it truthful or not, because it violates the integrity of the justice system and undermines the proper administration of justice. Quite simply, a witness has the solemn and fundamental duty to tell the truth. He or she should not be paid a fee for doing so.

*Golden Door Jewelry,* 865 F.Supp. at 1526.

¶ 85 Similarly, in *Accrued Financial Services, Inc. v. Prime Retail, Inc.,* 2000 WL 976800 (D. Md. No. CIV.JFM–99–2573, June 19, 2000) (unpublished order), *aff'd,* 298 F.3d 291 (4th Cir.2002), the court concluded that payment of witnesses violates the Maryland Rules of Professional Conduct and precluded paid witnesses, stating, "Financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process, which depends upon the truthfulness of the witnesses." *See also Farmer v. Ramsay,* 159 F.Supp.2d 873, 883 (D.Md.2001) ("[W]itness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States."), *aff'd,* 43 Fed.Appx. 547 (4th Cir.2002).

¶ 86 In *Golden Door Jewelry,* the court also determined that it was "of no moment" that the insurance company client rather than the lawyer was the actual source of the payment. 865 F.Supp. at 1526. As the majority notes here, the lawyer for plaintiff was well aware of, and acquiesced in, the contingent fee arrangement with Sumner.

¶ 87 Moreover, it matters not whether the paid witness is specifically directed to testify truthfully. *See In re Robinson,* 151 A.D. 589, 136 N.Y.S. 548, 556 (1912) ("[T]he payment of a sum of money to a witness to testify in a particular way, the payment of money to prevent a witness's attendance at a trial, the payment of money to a witness to make him 'sympathetic' with the party expecting to call him ... [constitute] payments which are absolutely indefensible."). And, "[t]he payment of a sum of money to a witness to 'tell the truth' is as clearly subversive of the proper administration of justice as to pay him to testify to what is not true." *Id.*

¶ 88 Nor does it matter if the payment is to be delivered in the future. In *Wagner v. Lehman Bros. Kuhn Loeb Inc.,* 646 F.Supp. 643, 646 (N.D.Ill.1986), the court disqualified an attorney who acquiesced in the promise of payment of a fee to a witness. Although no money had yet changed hands, the court concluded that

> the effect [of the promise of payment] on the potential witness is the same: he is induced by the promise of potential payment to give testimony he otherwise might

not have given. Moreover, the effect on the integrity of the judicial system is the same: the witness's testimony is inherently unreliable because of the promise of payment.

¶ 89 Whether cast in terms of the integrity of the justice system or the proper administration of justice, payment of a witness, particularly on a contingent fee basis where the payment depends on the outcome of the trial, necessarily undermines the fairness of the trial and prejudices the system of justice. Cross-examination or jury instructions that effectively elicit the bias of the paid witness may level the playing field in some instances, but they cannot undo the harm to the integrity of the justice system from the perspective of the public, the jurors, or the litigants who, after hearing of the paid witness, may perceive that testimony can be bought and sold.

¶ 90 Precluding the admission of evidence obtained contrary to ethical rules is not a novel remedy. *See Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*, 144 F.Supp.2d 1147, 1159–60 (D.S.D.2001) (barring admission of evidence obtained in violation of Rules of Professional Conduct), *aff'd*, 347 F.3d 693 (8th Cir.2003).

¶ 91 Nor is reversing a decision based on evidence obtained in contravention of rules against contingent fee witnesses unprecedented in Colorado. As noted by the majority, in *City & Cnty. of Denver v. Board of Assessment Appeals*, 947 P.2d 1373 (Colo. 1997), the supreme court vacated a valuation determination because the expert appraisers had contingent fee agreements with the taxpayer clients. Although the case turned on the statutory violation referenced by the majority, the supreme court noted that that the payment of contingent fees to experts also conflicted with the provisions of Colo. RPC 3.4. *Id.* at 1379. As the court noted, where the payment of the expert is contingent, "the witness' own interest will become intensified, and the reliability of the testimony and impartiality of the expert's position will be significantly weakened." *Id.* The same rationale applies to a fact witness paid on a contingent basis.

¶ 92 In *City & Cnty. of Denver*, the supreme court did not remand the case for an evaluation of the prejudice. Instead, it imposed the remedy of reversal and precluded the contingent fee witness, stating:

> Such contingent fee agreements cannot be the basis for procuring appraiser appearances or expert testimony under the 1996 version of the statute. The appearances here were unlawful and the BAA should not have allowed them.

*Id.* at 1381. Although striking the contingent expert's testimony necessitated a new proceeding, the supreme court determined that a new hearing was the only appropriate remedy.

¶ 93 Applying the same analysis here, I believe the appropriate remedy is to vacate the judgment and remand the case for a new trial.